**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KATHERINE YOST,

                Plaintiff,

      v.

EVERYREALM INC., COMPOUND ASSET
MANAGEMENT LLC, REALM METAVERSE REAL
ESTATE INC., REPUBLIC, REPUBLIC CRYPTO
LLC, REPUBLIC REALM MANAGER LLC,
REPUBLIC REALM INC., REPUBLIC
OPERATIONS LLC, OPENDEAL INC., OPENDEAL
PORTAL LLC, JANINE YORIO, in her individual and
professional capacities, WILLIAM KERR, in his
individual and professional capacities, and ZACH
HUNGATE, in his individual and professional
capacities,

                Defendants.

Index No.: 1:22-cv-06549

**COMPLAINT**

**Jury Trial Demanded**

      Plaintiff Katherine "Kathy" Yost, by her counsel, Seppinni LLP, alleges based on information and belief, at all relevant times, as follows:

**PRELIMINARY STATEMENT**

      1.    CEO Janine Yorio, holds digital real estate company Everyrealm[1] out as a paragon of progressive female-empowered tech entrepreneurship—the reality behind the company's walls is anything but.

      2.    To date, roughly ten current and former Everyrealm employees have come forward with shocking details of the toxic work environment that Everyrealm, Republic (and its related

---

[1] "Everyrealm" includes reference to Everyrealm Inc., Compound Asset Management LLC, Realm Metaverse Real Estate Inc., Republic, Republic Realm Manager LLC, Republic Crypto LLC, Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, and Republic Realm Inc., where relevant herein.

entities), Ms. Yorio, General Counsel William Kerr, Everyrealm employee Zach Hungate, and other managers and board members ("Defendants") have fostered and knowingly enabled.

3.     Defendants have used their positions of power to dupe employees, threaten, sexually harass, bully, or control women, Black employees, LGBTQ+ workers, disabled employees, and parents at Everyrealm.

4.     These allegations include, but are not limited to:

- The use of despicable slurs by Ms. Yorio and others against employees at Everyrealm, some of which are detailed herein (including "the whitest Black person," "moron," "idiot," "stupid," "addict," and "neurotic anorexic");

- Racist and ableist jokes made by Defendants at Black and disabled employees' expense—including comments by Ms. Yorio threatening to "trade" Black employees if they did not perform, and labeling an employee with autism spectrum disorder "The Team Mascot;"

- Instances of self-dealing, nepotism, and sexual harassment; and

- Creating a hostile work environment for all employees, but especially women, when, *inter alia*, Ms. Yorio and others openly disparaged women for their appearances, including Everyrealm investor Randi Zuckerberg, after Ms. Yorio was displeased that an article referencing Everyrealm and Ms. Zuckerberg did not shine the limelight on Ms. Yorio brightly enough.

5.     Defendants' sale of the so-called Metaflower Super Mega Yacht NFT for $649,853.07 under opaque circumstances garnered significant media attention.[2, 3, 4]



6.

7.     Defendants parlayed the attention from this mysterious sale into a roughly $60,000,000 Series A investment round valuing Everyrealm at over $200,000,000 from blue-chip

---

[2] Tony Ho Tran, Futurism, *Someone Paid $650,000 for a Nonexistent Yacht in the Metaverse: The Yacht is Comically Hideous, and can only be Described as "Minecraft-Esque" with its Block Design*, https://futurism.com/the-byte/650000-nft-yacht-metaverse (last visited Jul 31, 2022).

[3] Archyde, Technology News, *Would You Buy a Virtual Yacht for 650 thousand dollars on the Internet?*, https://www.archyde.com/would-you-buy-a-virtual-yacht-for-650-thousand-dollars-on-the-internet-technology-news-technology/ (last visited Jul. 31, 2022).

[4] Daily Telegraph NZ, Tech, *Virtual Megayacht Sold for $650k: A Yacht Featuring two Helipads, a hot tub, and a DJ Booth has been Sold for a Whopping $650,000 in the Sandbox Virtual Gaming World. **The Identity of the Metaflower Super Mega Yacht's Buyer is Unknown***, https://dailytelegraph.co.nz/tech/virtual-mega-yacht-sold-for-650k/ (emphasis added) (last visited Jul. 31, 2022).

[5] @Everyrealm, Twitter, https://twitter.com/everyrealm/status/1463301084512931841 (last visited Jul. 31, 2022).

investors including Andreessen Horowitz (led by Arianna Simpson[6]), Lightspeed Venture Partners, Coinbase Ventures, Dapper Labs, NGC Ventures, Dragonfly Capital, Liberty City Ventures, and Hash, among others.[7]

8.      Everyrealm's list of celebrity and influencer investors hoping to cash in on the company's promises is long and includes Will Smith (via Dreamers VC), The Weeknd, Nas, Post Malone (via Electric Feel Ventures), Lil Baby, Paris Hilton, Brie Larson, Gene Simmons, Gunna, Baby Keem, Hannah Bronfman, Fara Leff, Ebonie Ward, Miye Oni, Belly, Pro Logic, Mark Pincus, Jeffrey Zirlin, Anthony Saleh, NAV, Randi Zuckerberg, Wassim "SAL" Slaiby, Amir "Cash" Esmailian, Nancy Ajram, Mario Götze, Marc Anthony, and Jeffrey Katzenberg.

9.      Andreessen Horowitz's Cultural Leadership Fund facilitated many of these celebrity and influencer investor introductions.[8]

10.     Everyrealm's parent company, Republic,[9, 10] owned a sizable portion of Everyrealm's equity prior to the Series A financing round.

---

[6] Anita Ramaswamy, *Republic's Metaverse Real Estate Arm Spins off, Rebrands as Everyrealm,* TechCrunch, https://techcrunch.com/2022/02/10/republics-metaverse-real-estate-arm-spins-off-rebrands-as-everyrealm/ (last visited Jul. 31, 2022)

[7] Crunchbase, Everyrealm Financials, https://www.crunchbase.com/organization/Everyrealm/school_financials ("Andreessen Horowitz's Arianna Simpson led the round as a new investor alongside a mix of new and old backers") (last visited Jul. 31, 2022).

[8] Retail Technology Innovation Hub, *Paris Hilton and Various Other Celebs Back Metaverse Startup Everyrealm,* https://retailtechinnovationhub.com/home/2022/3/23/paris-hilton-and-various-other-celebs-back-metaverse-startup-everyrealm#:~:text=The%20venture's%20latest%20investors%20include,%2C%20Pro%20Logic%2C%20and%20NAV (last visited Jul. 31, 2022).

[9] Andrew Hayward, Decrypt, *Metaverse Land Investor Everyrealm Raises $60M Led by Andreessen*, https://decrypt.co/92664/metaverse-everyrealm-raises-60m-andreessen ("…**parent company Republic**, which remains a minority investor[.]" (Emphasis added) (last visited Jul. 31, 2022).

[10] Anita Ramaswamy, *Republic's Metaverse Real Estate Arm Spins off, Rebrands as Everyrealm,* TechCrunch, https://techcrunch.com/2022/02/10/republics-metaverse-real-estate-arm-spins-off-rebrands-as-everyrealm/ ("**Republic** has been an active investor in metaverse real estate properties **through its Republic Realm division**, headed since June 2020 by Janine Yorio.") (Emphasis added) (last visited Jul. 31, 2022).

11.    Republic used the Series A financing round as an opportunity to cash-out much of its equity ownership in its subsidiary but retains functional control over Everyrealm's day-to-day operations and its Board of Directors.[11] For example, Republic co-founder Andrew Durgee is Everyrealm's Managing Director and, upon information and belief, Chairman of Everyrealm's Board of Directors.[12] Additionally, many Everyrealm employees, including Plaintiff, signed employment offers with Republic and its subsidiaries but not with Everyrealm.

12.    Company insiders state that Everyrealm parent company Republic accepted investors' offer to quietly sell much of its stake in Everyrealm because it was aware of and participated in Everyrealm's mismanagement, which investors' due diligence either failed to uncover or deliberately ignored.

13.    Everyrealm employees reported a sharp change in Ms. Yorio's behavior and in the company's culture after Everyrealm closed its Series A round. Just days after the Series A round closed, Everyrealm employees reported hearing Ms. Yorio state that the company's "biggest focus" needed to be on raising its Series B round. In general, CEOs of fast-growing startups who

---

[11] SEC.gov, EDGAR, *Everyrealm/Realm Metaverse Real Estate Inc. Preliminary Offering Circular*, https://www.sec.gov/Archives/edgar/data/1854001/000149315222007846/partiiandiii.htm#a_009 at 32, 43 ("The Company has engaged Republic Realm Manager, LLC (the '*Manager*'), a Delaware limited liability company controlled by Everyrealm Inc. (an entity formed on September 28, 2021 under the name Republic Realm Inc., after the Company changed its name to Realm Metaverse Real Estate Inc., thus making its former name available, and renamed Everyrealm Inc. on February 3, 2022), to provide management services to the Company in accordance with a management agreement (the '*Management Agreement*'). Two individuals – Jesse Stein and Janine Yorio – who are agents of the Manager and Everyrealm Inc., serve, together with Andrew Durgee (all three, collectively, the "*Principals*"), as the executive officers of the Company and as the members of its board of directors. Under the Management Agreement, the Manager (i) assists in screening and evaluating business proposals and opportunities for the Company, (ii) assists as needed in respect of transactions under which the Company makes investments, (iii) monitors the holdings of the Company, and (iv) evaluates liquidity options and dispositions for assets held by the Company. The Manager is the sole owner of Class A Shares and, as of the date of this Offering Circular, has effective voting control of the Company. Republic Realm Inc. became the Manager's managing member and majority interest holder, when Compound Asset Management, LLC assigned and transferred, to Republic Realm Inc., Compound Asset Management, LLC's ownership interest and management responsibilities in the Manager. Everyrealm Inc. and Compound Asset Management, LLC are affiliated.") (last visited Aug. 2, 2022)

[12] *Id.*

have just closed large funding rounds shift focus to growing market share, developing a reliable revenue source, and hiring the best talent, but Ms. Yorio faced other pressures.

14.     Late in 2019, Ms. Yorio purchased a $2.75 million luxury condominium in Tribeca.[13]

15.     Then in 2020, she purchased a second home.[14]

16.     Shortly after the Series A closed, Ms. Yorio and Everyrealm's Board of Directors increased her salary from $230,000 to $400,000—an almost unheard-of sum for a Series A startup CEO.[15]

17.     Around this time, some employees began asking Defendants about the circumstances surrounding the identity of the anonymous Metaflower Super Mega Yacht NFT buyer. Defendants began terminating employees who showed even a slight propensity to question Ms. Yorio. Employees who are members of protected categories bore the brunt of this discriminatory firing spree. This campaign was conducted strategically to ensure that dissenting employees from underrepresented backgrounds were dealt with prior to reaching their one-year cliff vesting dates.

18.     Kathy Yost was one of these unfortunate employees.

19.     Ms. Yost is the mother and primary caretaker of her three children.

---

[13] Publicly available deeds.

[14] *Id.*

[15] Vanessa Kruze, *Do Founders of Startups that have Raised Millions Give Themselves Paychecks? If so, how Much Money do they Pay Themselves?*, Startup Q&A, https://kruzeconsulting.com/do-founders-of-startups-that-have-raised-millions-give-themselves-paychecks-if-so-how-much-money-do-they-pay-themselves/ ("[I]n the US tech startups that have raised money tend to pay their founder CEOs about $130,000 per year.") (last visited Jul. 31, 2022).

20.    Before Everyrealm terminated Ms. Yost (while she was out sick caring for her daughters who also had severe cases of COVID-19), she was the Human Resources ("HR") Director there. Everyrealm became one of the fastest growing Web3 startups under Ms. Yost's HR and recruiting leadership. Ms. Yost hired over sixty employees in less than a year. Unfortunately, none of that mattered to Defendants once Ms. Yost questioned Ms. Yorio and raised concerns about illegal behavior and policies at Everyrealm.

21.    Notwithstanding Everyrealm's purported inclusiveness, Defendants did not accept that Ms. Yost was a single parent, openly bisexual, disabled, and refused to rubberstamp Everyrealm's discriminatory and illegal policies and acts. Defendants discriminated against Ms. Yost because of her gender, sexuality, caregiver status, disability status, and for taking protected sick and family leaves.

22.    Defendants retaliated against Ms. Yost when they terminated her the day after she informed her superiors, Mr. Kerr and Ms. Yorio, that she could not to comply with their plainly illegal, retaliatory, and discriminatory personnel policies that made women and other protected groups second-class employees at Everyrealm.

23.    Since Ms. Yost confidentially made Defendants' aware of her potential claims in July 2022, Everyrealm has threatened her with lawsuits, sanctions, and massive personal liability if she files this lawsuit, and has repeatedly demanded that she sit "individually" for a two-hour investigatory interview with Defendants' "independent" investigator.

24.    As a result of Defendants' unlawful conduct and the hostile work environment it created, Ms. Yost asserts claims of discrimination, retaliation, and interference with her protected rights under the New York City Human Rights Laws ("NYCHRL"), N.Y.C. Admin. Code, §§ 8-107, et seq.; claims of discrimination, retaliation, and interference with her protected rights under

7

the New York State Human Rights Laws ("NYSHRL"), pay discrimination under New York Labor Law § 194; claims of whistleblower retaliation under the New York Whistleblower Law N.Y. Labor Law § 740, et seq.; retaliation for taking sick leave and alerting management that reducing sick leave could violate New York Labor laws under N.Y. Labor Law § 215; claims of pay discrimination under the Equal Pay Act, 29 U.S.C. §§ 206 et seq, and claims of common law Intentional Infliction of Emotional Distress.  Ms. Yost seeks declaratory relief, monetary damages, attorneys' fees, and all other appropriate relief.

## THE PARTIES

25.    Plaintiff Kathy Yost is a citizen of the State of Maryland, who is 46 years old at the time of this writing. At the times relevant herein she worked in New York, New York, and/or the improper acts committed against her and others in the cases in which she intervened had their impact in New York. At all relevant times, Ms. Yost met the definition of an "employee" and/or "eligible employee" under all applicable statutes. At all relevant times herein, Ms. Yost was an employee of Defendant Everyrealm and/or Defendant Republic.

26.    Defendant Everyrealm Inc. is a so-called digital real estate company and a Delaware corporation with its principal place of business in New York, New York. Upon information and belief, Everyrealm acts as a contractor and/or agent to various public companies, including Atari SA (ticker: PONGF) and is regulated by the Securities Exchange Commission.[16] At all relevant times, Everyrealm met the definition of an "employer" or "covered employer" under all applicable statutes.

27.    Defendant Realm Metaverse Real Estate Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary or alter ego of Everyrealm

---

[16] SEC.gov, EDGAR, *Everyrealm/Realm Metaverse Real Estate Inc. Preliminary Offering Circular*, https://www.sec.gov/Archives/edgar/data/1854001/000149315222007846/partiiandiii.htm#a_009

Inc. At all relevant times, Realm Metaverse Real Estate Inc. met the definition of an "employer" or "covered employer" under all applicable statutes.

28.     Defendant Compound Asset Management, LLC is a Delaware Limited Liability Corporation with its principal place of business in New York, New York. It is affiliated with and/or a subsidiary or alter ego of Everyrealm, Inc. At all relevant times, Compound Asset Management, LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

29.     Defendant Republic, an alternative asset crowdfunding company and a Delaware Corporation, is Everyrealm's parent company and/or, in the alternative, was Everyrealm's parent company at times relevant herein. Republic may be a trade name of Defendants Republic Operations LLC, Opendeal Inc., and Opendeal Portal LLC, *inter alia*. At all relevant times, Republic met the definition of an "employer" or "covered employer" under all applicable statutes. Any use of "Republic" in this complaint includes reference to Defendants Republic, Republic Operations LLC, Opendeal Inc., and Opendeal Portal LLC.

30.     Republic Realm Manager LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Operations LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

31.     Defendant Republic Crypto LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Operations LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

32.     Defendant Republic Operations LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times,

Republic Operations LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

33.     Defendant Opendeal Inc. is a Delaware Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Inc. met the definition of an "employer" or "covered employer" under all applicable statutes.

34.     Defendant Opendeal Portal LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Portal LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

35.     Defendant Janine Yorio is a member of Everyrealm's Board of Directors and its CEO. She subjected Ms. Yost to repeated acts of sexual harassment and discrimination and aided and abetted similar misconduct against Ms. Yost. At all relevant times, Ms. Yorio was employed by Everyrealm and/or Republic and met the definition of an "employer" or "covered employer" under all applicable statutes.

36.     Defendant William Kerr is Everyrealm's General Counsel. He subjected Ms. Yost to repeated acts of harassment and discrimination and aided and abetted similar misconduct against Ms. Yost. At all relevant times, Mr. Kerr was employed by and/or in the alternative acted as an agent of Everyrealm and/or Republic. Mr. Kerr met the definition of an "employer" or "covered employer under all applicable statutes.

37.     Defendant Zach Hungate is an Everyrealm employee. He subjected Ms. Yost to acts of harassment, created a hostile work environment, and aided and abetted similar misconduct against Ms. Yost. At all relevant times, Mr. Hungate was employed by Everyrealm and/or Republic.

10

**JURISDICTION AND VENUE**

38.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

39.    The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332, as there is diversity of citizenship between Plaintiff, a resident of the State of Maryland, and Defendants, who are either, upon information and belief, New York State residents and/or are headquartered in New York State, and this action involves a matter in controversy that exceeds $75,000, exclusive of interest and cost.

40.    This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

41.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district. Defendants' principal place of business is in this district.

**ADMINISTRATIVE PROCEDURES**

42.    Following the commencement of this action, Plaintiff will file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff will file an Amended Complaint to include claims under Title VII upon receipt of a Notice of Right to Sue.

43.    Following the commencement of this action, Plaintiff reserves the right file an Administrative Complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the whistleblower provisions of the Sarbanes-

Oxley Act. Plaintiff reserves the right to file an Amended Complaint to include claims under the Sarbanes-Oxley Act upon receipt of a letter from OSHA providing her with an administrative dismissal and withdrawal of the Administrative Complaint.

44.     Pursuant to NYCHRL § 8-502, Plaintiffs will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

45.     Pursuant to NYLL § 215(2)(b), contemporaneously with the commencement of this action, Plaintiff will serve a copy of this Complaint upon the Office of the New York Attorney General, providing notice of the claims set forth in this action.

46.     Plaintiff has complied with any and all other prerequisites to filing this action.

## FACTUAL ALLEGATIONS

I.     **Ms. Yost Begins Working at Everyrealm**

47.     Ms. Yost and Ms. Yorio attended high school together and were acquaintances there.

48.     Since high school, the two remained friends on Facebook.

49.     During November 2020, Ms. Yorio posted on Facebook that she was tired of doing "the people stuff" at Everyrealm and that she was looking to hire an HR professional to take those day-to-day duties off her plate.

50.     Ms. Yost, an experienced HR professional with a degree in Business Administration and an HR concentration, and decades experience working in HR, contacted Ms. Yorio and offered her services. Ms. Yost was the owner of an HR consultancy.





51.

52.     Ms. Yorio engaged Ms. Yost's consultancy, and for six weeks Ms. Yost worked as a contractor as Everyrealm's (then called Republic Realm, a subsidiary of Defendant Republic) external Chief HR Officer.

53.     Ms. Yost was Everyrealm's one-woman HR and recruiting department. She handled everything from scheduling candidate interviews, to proposing and implementing company-wide HR policies.

54.     As Everyrealm experienced explosive headcount growth, the demands on Ms. Yost grew to the point that her work for Everyrealm encroached on the time she had promised other clients.

55.     Ms. Yost gave Ms. Yorio an ultimatum: either bring Ms. Yost on as a full-time employee or she would need to put hard limits on the time she spent working for Everyrealm.

56.     Because of Ms. Yost's stellar performance Ms. Yorio offered Ms. Yost a full-time job.

57.     The job offer came from Republic subsidiary, Republic Realm, on its letterhead.

**II.     Ms. Yost Experiences Gender and Pay Discrimination at Everyrealm**

58.     Defendants offered Ms. Yost a $140,000 base salary, a discretionary $25,000 bonus, and 0% in equity.

59.     Ms. Yost has since learned that Everyrealm paid male employees with less experience in similarly leveled roles who had similar responsibilities over $100,000 more in base salary and millions of dollars in Everyrealm equity.

60.     When Ms. Yost attempted to negotiate for herself and mentioned that men with less experience and education were paid more for substantially similar work and/or lower level work at Everyrealm, Ms. Yorio promised Ms. Yost she would "take care of her" and raise her salary once certain male employees got their raises first.

61.     Ms. Yorio told Ms. Yost while they were in the New York City office that "all the men here are castrated" and that she did not want to do anything to make the men at Everyrealm "feel more castrated." In other words, because Ms. Yorio earned more than the men at Everyrealm (*see supra* at ¶ 16) she wanted to protect their male egos by preventing another woman, Ms. Yost, from also exceeding their salaries.

62.     Ms. Yost, the lead HR professional at a $200,000,000 technology startup, was not given a work laptop and instead conducted her work on a personal device that she bought and paid for with her money.

63.     Nevertheless, excited by the opportunity to join a fast-growing startup and by Ms. Yorio's promise that she would "take care of her," Ms. Yost informed her other consulting clients that she had accepted a job at Republic/Everyrealm and wound up her consulting business.

64.     Ms. Yorio made good on her promise to consider Ms. Yost for a raise that would not threaten male egos at Everyrealm. Once the men whose salaries Ms. Yorio would not allow to fall below that of Ms. Yost's were raised, Ms. Yost received a 14.29% raise, which was among the three lowest raises at the company during that compensation cycle. In line with Ms. Yorio's "castration" comments, despite this raise, Ms. Yost's salary never met nor exceeded her male counterparts' salaries.

## III.     Cracks in Everyrealm's Progressive Façade Show

65.     Even though Everyrealm promotes its acceptance of employees from diverse backgrounds—for example, Everyrealm.com quotes Ms. Yorio as saying, "If the metaverse is to be a virtual reflection of the real world . . . its demographics must reflect those of the real world as well[,]"[17]—this equality never extended to Ms. Yost.

66.     Ms. Yorio emphasized Ms. Yost's high performance and the discrimination she endured at Everyrealm when she wrote in Ms. Yost's performance review that "I may not always agree with your methods right out of the gate, but your instincts are impeccable and I usually come around. . .. The feedback I receive about you is so uniformly positive and basically all in this vein: 'At first I thought she was too different, but now I get it, and she's fantastic.' Keep it up. We need you."

---

[17] Everyrealm, About Page, https://everyrealm.com/about (last visited on Jul. 31, 2022).

67.    "Too different" was a thinly veiled euphemistic insult for Ms. Yost's disclosed disabilities, her open bisexuality, and her status as perhaps Everyrealm's only single mother, among other protected attributes.

68.    While Ms. Yorio viewed Everyrealm employees' disparaging remarks against Ms. Yost as a feel-good story, Ms. Yost just wanted to be valued fairly for the work she accomplished. But because she suffers from multiple disclosed chronic diseases, identifies as bisexual, and is a single parent she was subject to a barrage of cruel, discriminatory, demeaning, and meanspirited attacks by Defendants.

## IV.    Ms. Yost Pushes Back Against Ms. Yorio's Discrimination Against Disabled Employees

69.    Ms. Yost began noticing, and speaking out against, Ms. Yorio's discriminatory conduct during her frequent mandatory work trips to Everyrealm's New York City office.

70.    Ms. Yost suffers from multiple chronic diseases including attention deficit hyperactivity disorder ("ADHD"). She disclosed her disabilities to Defendants.

71.    As a decent human, an ally, and a competent HR executive she spoke up when others were cruelly maligned by Defendants for their disabilities, real or perceived.

72.    For example, in June 2022, in Everyrealm's New York City office, Ms. Yost witnessed Ms. Yorio and Mr. Kerr disrespecting a disabled employee. Each Defendant was aware that this employee suffers from dyslexia and attention ADHD, yet Ms. Yorio referred to this employee as a "moron"[18] and an "idiot"[19] for allegedly ordering an incorrect amount of office snacks.

---

[18] "*dated*, *now offensive*: a person affected with mild intellectual disability," *Moron*, Merriam-Webster Dictionary (Online ed.) (italics in original) (last accessed July 31, 2022).

[19] "*dated, now offensive*: a person affected with extreme intellectual disability," *Idiot*, Merriam-Webster Dictionary (Online ed.) (italics in original) (last accessed July 31, 2022)

73.    While in Everyrealm's office, Ms. Yost pulled Ms. Yorio aside after this incident and told her, "It is Everyrealm's responsibility to ensure that disabled employees have the tools to do their jobs with their disabilities" and that it is inappropriate to mock disabled employees. Ms. Yorio became irate and continued to mock the employee in front of between six and eight other Everyrealm employees. She yelled that the disabled employee was "stupid."

74.    The next day, Ms. Yost pulled Mr. Kerr, her manager, aside to share similar feedback after he had been away from the office for a few hours. Ms. Yost noticed alcohol on Mr. Kerr's breath and believes that he was intoxicated. Nevertheless, Ms. Yost shared the same feedback with Mr. Kerr and told him that "as a leader at Everyrealm it is important that you do not play into Ms. Yorio's misbehavior, especially around young impressionable employees who don't have the experience in the workplace that you and I do."

75.    Mr. Kerr said, "You know Janine. She's gonna' do what she's gonna' do."

76.    Ms. Yost, troubled by this incident, but hoping it was a one-off event, went back to work at her desk.

77.    This would not be a one-off event.

78.    In another troubling incident that occurred in Everyrealm's New York City office, Ms. Yorio showed Ms. Yost an email communication in which an Everyrealm manager mockingly referred to an employee diagnosed with autism spectrum disorder ("ASD") and ADHD as "The Team Mascot" in a communication with Ms. Yorio.

79.    Ms. Yorio did not reprimand this manager for belittling and humiliating a disabled employee. Instead, Ms. Yorio instructed Ms. Yost to "Put The Mascot on a 30-day performance plan." Ms. Yost refused to carry out this illegal order. She understood Ms. Yorio's use of "The Mascot" to be a derogatory nickname used to mock this employee's disabilities.

17

80.     In yet another disconcerting episode that occurred in Everyrealm's New York City office, Ms. Yost witnessed Ms. Yorio refer to a female executive at the company as a "neurotic anorexic" in front of other Everyrealm employees.

81.     Ms. Yost again made clear her discomfort with Ms. Yorio's use of ableist disparaging language to describe her co-worker, but it was to no avail.

## V.     Ms. Yorio Creates a Hostile Work Environment and Attempts to Implicate Ms. Yost in her Racist and Discriminatory Hiring Schemes

82.     Ms. Yorio and other Everyrealm employees relentlessly focused on race in the hiring process at Everyrealm.

83.     Ms. Yost recalls a candidate interview debrief conversation with Ms. Yorio and her husband, Jesse Yorio, in which the couple made racist remarks about a Black applicant.

84.     To kick the debrief off, Ms. Yorio told Ms. Yost and Mr. Yorio that the candidate is "the whitest Black guy I've ever met."

85.     Ms. Yost responded, "Hey, we don't say that."

86.     Ms. Yorio, attempting to clarify her remarks but instead doubling down on her racist rhetoric replied, "No, I mean it in a good way."

87.     When Ms. Yost told Ms. Yorio "There is no good way," Mr. Yorio chimed in with "I've never heard that before."

88.     Ms. Yost attempted to move on by stating "Look, it's learning. We all learn." But Ms. Yorio took Ms. Yost's feedback as a slight and retaliated against her by yelling to justify her remarks.

89.     Ever the optimist that Ms. Yorio might take her critiques seriously and learn to stop treating applicants differently based on their race, Ms. Yost sent Ms. Yorio an article with academic research on Code Switching.

90.     There is no indication that Ms. Yorio read this article.

91.     In another incident, Ms. Yost informed Ms. Yorio that an Everyrealm applicant with a Masters in Business Administration degree and a Certified Public Accountant certification requested an additional $10,000 dollars towards her base salary and that Ms. Yost was supportive of her request.

92.     This candidate was of Indian descent and adopted as a child.

93.     In a clear reference to this employee's race and adoption status, Ms. Yorio told Ms. Yost that "More base is out of the question. We're not a charity."

94.     Ms. Yost then laughed and instructed Ms. Yorio to deliver the news.

**VI.     Ms. Yorio Repeatedly Sexually Harasses Ms. Yost**

95.     Ms. Yorio frequently discussed her theories about the sexuality of other Everyrealm employees in the office with Ms. Yost.

96.     Ms. Yorio's sexually explicit soliloquies were unwelcomed by Ms. Yost.

97.     Ms. Yorio sexually harassed Ms. Yost because she is openly bisexual, and Ms. Yorio prejudicially thought that this attribute made Ms. Yost an expert on others' sexual orientations.

98.     For example, unprompted, Ms. Yorio cornered Ms. Yost and told her that she believed a senior executive at Everyrealm to be "in the closet," and implied that she was interested in Ms. Yost's opinion on the matter.

99.     Ms. Yost found this speculation about a colleague's sexuality to be harassing and grossly inappropriate.

100.    In another cruel and disturbing instance, Ms. Yorio repeated to Ms. Yost that an employee she "think[s] is in the closet" told her during a company celebration in New York the night before that another employee's "balls will be in [his or her] mouth by the end of the night."

101.    Ms. Yost did not initiate this conversation and was so appalled and dismayed when Ms. Yorio used this sexually explicit language with her at work that she was physically stunned into silence.

102.    On another occasion, Ms. Yorio again cornered Ms. Yost and sexually harassed her by discussing another employee's purported sex life at work.

103.    Ms. Yorio was insistent that a cofounder of the company is a "virgin," and that she was "not sure" if he or she was aware that he or she is "an asexual or bisexual."

104.    Ms. Yorio told Ms. Yost that she developed these sexual theories about this cofounder after trying to set him or her up with "pretty girls all the time [but] [he or she] doesn't seem interested."

105.    Ms. Yorio then told Ms. Yost that this cofounder "can't manage [his or her] way out of a paper bag." Ms. Yost responded to this comment by ignoring Ms. Yorio's sexual harassment and instead offering to take on an increased role at Everyrealm.

106.    Rather than accept Ms. Yost's offer, Ms. Yorio eventually instructed Ms. Yost to process a raise for this employee to $230,000.

**VII.    Ms. Yost is Passed Over for Promotion Opportunities because She is a Woman and a Mother, and in Retaliation for Speaking Up**

107.    Ms. Yorio reported numerous performance lapses by Everyrealm's General Counsel and Ms. Yost's manager, Mr. Kerr, to Ms. Yost.

108.    Mr. Kerr was, at times, classified as a 1099 contractor at Everyrealm. At all times, Defendants exercised direct control over Mr. Kerr's work. Mr. Kerr worked from Everyrealm's

New York office, used Everyrealm equipment, and managed Everyrealm employees, including Ms. Yost.

109.     On one occasion, Mr. Kerr went nonresponsive for a week. There were crucial contracts and statements of work that needed to be completed during this time. Ms. Yost stepped up and oversaw this work in Mr. Kerr's unexpected absence.

110.     During Mr. Kerr's absence, Ms. Yorio asked Ms. Yost to "put [Mr. Kerr] on a 30-day performance plan." Ms. Yost informed Ms. Yorio that (1) Mr. Kerr is a contractor and cannot have his performance managed as though he is an employee, and (2) that Ms. Yost reported to Mr. Kerr and feared retaliation if she raised Ms. Yorio's performance concerns with him herself.

111.     Ms. Yorio proceeded to tell Ms. Yost that "Bill is a liar and he can't be trusted."

112.     Ms. Yorio then told Ms. Yost that she had caught Mr. Kerr in several lies and that she "thinks he has some disorder and that's why he can't hold a job down like a regular person" and said ". . . Bill repeatedly fucked up . . .."

113.     Ms. Yost did not inquire further as to what Ms. Yorio meant by these statements because she was preoccupied by the fact that her career progression was being illegally impeded by Defendants. Instead, Ms. Yost told Ms. Yorio "Let [Mr. Kerr] do legal and give me a shot – I've done it and on a bigger scale." Ms. Yost was proposing that she take over the operations responsibilities that Ms. Yorio said Mr. Kerr had "repeatedly fucked up."

114.     Ms. Yorio told Ms. Yost that the time she spent working from home "wasn't a good look" but that she would consider Ms. Yost's proposal. Ms. Yorio then informed Ms. Yost the next week that she was giving Mr. Kerr another chance. Ms. Yost understood that Ms. Yorio rejected her proposal, in part, because she was a woman and a mother who cared for her kids at home in addition to her job's responsibilities in New York. Numerous men at Everyrealm held roles with

broad executive responsibilities while maintaining hybrid in-office/home working schedules including Mr. Yorio, Mr. Hungate, and even fully remote male employees like CFO James Goede.

## VIII. Defendants Witness Everyrealm Employee Zach Hungate Intimidate Ms. Yost and then Promote Him

115.    While in Everyrealm's New York City office, Defendant Zach Hungate intimidated and harassed Ms. Yost in other Defendants' presence.

116.    Ms. Yost was speaking with Ms. Yorio and another Everyrealm employee when Mr. Hungate approached them. Mr. Hungate showed Ms. Yorio his phone screen. Ms. Yorio shrugged, motioned towards Ms. Yost, and said, "show it to Kathy, see what she says."

117.    Mr. Hungate blurted, "I want her gone" as he crept uncomfortably close to Ms. Yost's face and showed her his phone. Mr. Hungate leaned even closer to Ms. Yost's face and said, "Lea has to go."

118.    Ms. Yost, leaning back in her seat to create space, asked "Why?"

119.    Mr. Hungate showed Ms. Yost a screenshot of a text message exchange with an employee's name atop it.

120.    Ms. Yost saw roughly five messages on the cropped screenshot. One of the messages asked, "Did Zach [Hungate] get lip fillers?" to which Everyrealm employee Tyler Matses replied, "not sure," or something to that effect.

121.    Ms. Yost asked Mr. Hungate how he came to possess these messages. Mr. Hungate told her that Mr. Matses sent the screenshot to him.

122.    Ms. Yost reviewed the messages and told Mr. Hungate, "Well, nothing here suggests [this employee] isn't doing her job. However, if you are feeling harassed regarding her discussion about your physical appearance, I would be happy to speak with her."

123.    At this point, Ms. Yost stood up from her seat because Mr. Hungate was looming over her menacingly. As she stood up, Mr. Hungate became irate at Ms. Yost and yelled, "No, she can't know we have a mole!" This was an apparent reference to the risk that the employee would learn that Mr. Matses was acting as an informant, or "mole," for Mr. Hungate.

124.    Ms. Yost, shocked to the point that her eyebrows shot up towards her hairline, responded, "a do-what-now?"

125.    Ms. Yost was concerned because it was apparent that Mr. Hungate was encouraging employees to spy on women at Everyrealm and Ms. Yorio appeared ambivalent at best and supportive of this behavior at worst.

126.    The week prior, Mr. Hungate was removed as this employee's manager because Ms. Yost received reports from Everyrealm employees that she was crying in Everyrealm's office hallway and being comforted by none other than Mr. Matses, Mr. Hungate's "mole."

127.    Ms. Yost said to Mr. Hungate, "You want me to fire her, but I can't say why?"

128.    Mr. Hungate replied, "You don't have to tell her why."

129.    In Ms. Yorio's and Mr. Hungate's presence, Ms. Yost asked, "Have either of you spoken to [this employee] about any performance issues or inappropriate conversations in text, Slack or another media?"

130.    They each answered "No."

131.    Mr. Hungate then took an aggressive step towards Ms. Yost and said harassingly, "You're being ridiculous and she fucking sucks."

132.    Ms. Yorio stood in silence.

133.    Ms. Yost replied, "If she sucks, you haven't given me anything to prove it." Ms. Yost reiterated, "She doesn't report to you anymore, so why don't you let the manager that's overseeing her now assess her job performance."

134.    As Ms. Yost collected her things and prepared to walk away, Mr. Goede, perhaps sensing Mr. Hungate's threatening demeanor and seeing that Ms. Yost was upset, offered to walk her out.

135.    At the time, Mr. Kerr was nodding off on a couch nearby.

136.    Ms. Yost and Mr. Goede walked into the lobby where she recounted her interaction with Mr. Hungate to him and reported Mr. Hungate's threatening and harassing behavior. Mr. Goede is a member of Everyrealm's Compliance Committee. He expressed that he was shocked and appalled and vowed to Ms. Yost that he would "get involved."

137.    Ms. Yost left the office feeling physically sick due to the incident and nearly threw up on her walk home.

138.    Nevertheless, Ms. Yost informed the employee that she should refrain from "texting Tyler [Matses] unless business necessary . . .."

139.    Ms. Yost believes that Mr. Goede recounted the incident to Mr. Kerr because in the office the next morning Mr. Kerr approached Ms. Yost and began with, "Sorry, I usually don't have more than two drinks. I heard what happened."

140.    Ms. Yost, still upset over the incident from the day before and stunned that her confidential report to Compliance Committee member Mr. Goede was shared with her manager without her consent said firmly, "Well, what are you going to do about it? We have 'moles?'"

141.    Mr. Kerr laughed.

142.   Ms. Yost concluded their interaction by saying, "I don't want this guy [Mr. Hungate] anywhere near me again."

143.   Ms. Yost was never contacted by anyone investigating this incident. Instead, Mr. Hungate was given a promotion and a significant raise by Defendants.

**IX.   Ms. Yorio Repeatedly Taunted Ms. Yost Regarding Her Disclosed Disability**

144.   Ms. Yost suffers from alcohol use disorder and works hard to successfully keep her symptoms at bay. She disclosed this disability to Ms. Yorio and to Everyrealm because she believed Ms. Yorio would be her ally and help deflect attention from the fact that Ms. Yost does not drink at company gatherings. Instead, Ms. Yorio used this highly personal and confidential information to taunt Ms. Yost in front of Everyrealm employees in New York City.

145.   On one such occasion, Everyrealm hosted an event at which alcohol was present. When Ms. Yost arrived at the event Ms. Yorio shouted, "We need to get Kathy *SIX* drinks!"

146.   Ms. Yost, in shock, replied, "Uh, no, I'll have a club soda."

147.   Ms. Yost understood Ms. Yorio to be pressuring her to drink and making fun of her disability.

148.   On another occasion, Ms. Yorio attempted to gossip with Ms. Yost about what she perceived as an employee's cocaine addiction.

149.   During the conversation Ms. Yost asked, "Is this something interfering with this person's job, or do I need to be concerned for safety or health reasons?"

150.   Ms. Yorio then backtracked and said that every time she parties with the employee he "pulls out cocaine" so she "assume[s] he's an addict."

151.   Ms. Yost understood Ms. Yorio to have used the term "addict" as a derogatory smear because she knew it would upset Ms. Yost.

25

152.    Ms. Yorio was aware when she called this employee an "addict" that Ms. Yost was receiving substance use treatment.

**X.    Ms. Yorio, Mr. Kerr, and Everyrealm Retaliate Against Ms. Yost for Blowing the Whistle on Gender Discrimination and for Taking Sick Leave and Family Leave**

153.    On or about June 19, 2022, Ms. Yost and two of her three children were diagnosed with COVID-19.

154.    Ms. Yost informed Ms. Yorio and Everyrealm's executive team that she was unable to make a scheduled trip to the New York office to attend NFT Week. Nevertheless, despite being ill and the primary caretaker of her children, Ms. Yost made clear to her coworkers that she could be reached in true emergencies. Ms. Yost made it a priority to check in on her work accounts multiple times per day while caring for her sick children. Late on a Saturday night after 10:00 p.m., Ms. Yost received a barrage of notifications from Ms. Yorio.

155.    A couple of days into her protected sick leave and caregiver leave, Ms. Yorio, Mr. Kerr, and Everyrealm became concerned that employees, including Ms. Yost, were abusing Everyrealm's leave policies by taking time off to care for themselves and their loved ones.

156.    So, Ms. Yorio, Mr. Kerr, and their teams wrote a slapdash two-tiered vacation policy, a reduced sick-leave policy, and a restrictive remote work policy.

157.    Their policies required female-dominant roles to work in the office and limited women's vacation and sick-time, while Everyrealm would offer employees in male-dominated roles like engineering unlimited leave and vacation, and the men could work from home.

158.    Ms. Yorio knew that Ms. Yost was out sick with COVID-19 and taking care of her sick daughters when Defendants drafted these policies; nevertheless, after 10:00 p.m. on a Saturday, Ms. Yorio shared the "urgent" proposed policy change that she expected Ms. Yost to review.

159.    Despite being ill and exhausted, Ms. Yost complied and left thoughtful comments in the policy document.

160.    Ms. Yost informed Ms. Yorio that the proposed policies were non-compliant, illegal, discriminatory, and shared that it was not an HR best-practice for the company to use certain gendered language like "grandfathered" in company-wide policies.

161.    Before going to bed that night, Ms. Yost reported to Mr. Kerr that if Ms. Yorio went forward with the proposed discriminatory leave policy changes, Ms. Yost "[would not] be staying on board."

162.    Sensing that she might be retaliated against, Ms. Yost wrote to Mr. Kerr, "If [Ms. Yorio] cuts off my access please text me so I know what to expect [###-###-####][.] I've also alerted her to the discriminatory nature of the draft policy and language within it and advised her not to use it[.] Did this policy have something to do with my being out last week for Covid-19[?] I was supposed to be in New York so I guess now I get it[.]"

163.    Sure enough, by the next morning Everyrealm had cut off Ms. Yost's access to all company platforms.

164.    On June 26, 2022, Ms. Yost emailed Mr. Kerr stating, in part, "When I informed Janine that allowing the engineering subgroup to have access to a special set of benefits is creating adverse impact because it is discriminatory against women she replied 'I'm not making this about gender.'"

165.    Ms. Yost continued, "Data doesn't lie and the policy clearly outlines a discriminatory practice of allowing one employee group a benefit that women at Everyrealm do not have access to . . .."

27

166.    Ms. Yost then asked, "why [was] my technology so abruptly cut off and what []
should [I] expect in terms of next steps in communication[?] I stand by my assessment of the
policy."

167.    Two days later, Ms. Yost had not received a reply from Mr. Kerr nor Everyrealm.
She followed up with Mr. Kerr and stated, in part, "[L]et me make myself clear that while I did
tell Janine that I would not administer any policy that I found to be discriminatory or non-
compliant, at no time did I resign from my position. I am a divorced, single mother of three, who
receives zero financial support, with a chronic health condition who [cannot] afford to leave my
position without another prospect. Being asked to do something illegal or unethical is not a
choice."

168.    Later that day, Mr. Kerr responded to Ms. Yorio, "I have commenced an
investigation into the allegations you have presented."

169.    But then on June 29, 2022, Mr. Kerr replied again—in the same thread in which
Ms. Yost reaffirmed that she never resigned—stating, "Kathy, Enclosed please find a letter
confirming your resignation."

170.    In response to this transparent gaslighting, Ms. Yost replied, this time copying
Everyrealm's Chief Financial Officer, James Goede and Board Member and employee Julia
Schwartz, "I've stated numerous times that I did not resign. I objected to Ms. Yorio's continued
[indifference] regarding my feedback about the policy she intends to implement. The policy was
non-compliant and discriminatory. Affirming that I will not carry out discriminatory or non-
compliant behavior is not resignation of employment."

171.    Ms. Yost was out sick caring for her three children and herself when Everyrealm
terminated her.

172.    Two of Ms. Yost's children were sick with COVID-19 at the time.

173.    Everyrealm did not offer Ms. Yost a single day of COBRA payment even though the company knew that (1) she was out on protected sick leave and caregiver leave when it terminated her without notice and (2) that Ms. Yost relied on Everyrealm's insurance plan for her substance use treatment among other necessities.

174.    As a result, Ms. Yost has funded her and her children's medical expenses out-of-pocket. These expenses include doctor visits, prescription medications, counselling, therapy, and more. Many of these expenses are a direct result of the emotional distress that was intentionally inflected on Ms. Yost by Defendants.

175.    Ms. Yost has also had to go without receiving crucial medical care for the disabilities she disclosed to Defendants due to the callous way in which she was terminated.

176.    Ms. Yost has suffered from debilitating insomnia as a direct result of Defendants' misconduct, has been unable to eat or keep food down for days at a time, and has suffered severe bleeding and permanent damage to her hands and fingers due to the emotional distress that Defendants knowingly caused in this event and the others described below.

**FIRST CAUSE OF ACTION**
**Violations of the Equal Pay Act**
**(Against Everyrealm, Republic, Republic Operations LLC, Opendeal Inc.,**
**Opendeal Portal LLC, Janine Yorio, and William Kerr)**

177.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

178.    During the period of the employment of Plaintiff, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. §§ 206 et seq. During that time, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment,

and paid Plaintiff at a rate of pay, including salary, bonus, and equity less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

179.    Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative, unwillfully, discriminated against Plaintiff and the members of the EPA Collective on the basis of her gender and by paying Plaintiff a lesser rate of pay, including salary, bonus, and equity, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

180.    By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. §206 et seq.

181.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

182.    Plaintiff is further entitled to liquidated damages, reasonable costs, and attorneys' fees.

### SECOND CAUSE OF ACTION
**Violations of New York Labor Law Equal Pay Law**
**(Against Everyrealm, Republic, Republic Operations LLC, Opendeal Inc.,**
**Opendeal Portal LLC, Janine Yorio, and William Kerr)**

183.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

184.    The claims brought herein under the New York Labor Law § 194 are brought on behalf of Plaintiff.

185.    During the period of the employment of Plaintiff and Defendants were subject to the provisions of the New York Labor Law § 194. During the employment of Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary, bonus, and equity, less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a bona fide factor other than gender, such as education, training, or experience.

186.    Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative, unwillfully, discriminated against Plaintiff and the members of the EPA Collective on the basis of her gender and by paying Plaintiff a lesser rate of pay, including salary, bonus, and equity, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

187.    By the actions described above, among others, Defendants have violated the New York Labor Law.

188.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiff suffered, and continue to suffer, harm for which she is entitled to an award of monetary damages and other relief.

189.    Plaintiff is further entitled to liquidated damages, reasonable costs, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Discrimination in Violation of the New NYSHRL**
**(Against all Defendants)**

190.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

191.    By the acts described above, Defendants discriminated against Plaintiff based on her sexual orientation, gender, marital status, caregiver status, gender expression, disability status, and sexually harassed her in violation of Executive Law of New York, § 296 et seq.

192.    Defendants are liable under the NYSHRL as Plaintiff's "employer."

193.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

194.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

195.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Retaliation in Violation of the NYSHRL**
**(Against Everyrealm, Republic, Republic Operations LLC, Opendeal Inc.,**
**Opendeal Portal LLC, Janine Yorio, and William Kerr)**

196.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

197.    By the acts described above Defendants retaliated against Plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the

Executive Law of New York, § 296 *et seq* by, *inter alia*, ignoring her protected complaints about the discriminatory treatment of herself and other employees, subjecting her to increased scrutiny and harassment, and ultimately terminating her.

198.    Defendants are liable under the NYSHRL as Plaintiff's "employer."

199.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

200.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

201.    Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL entitling Plaintiff to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL
### (Against all Defendants)

202.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

203.    By the acts described above, Defendants discriminated against Plaintiff based on her sexual orientation, gender, caregiver status, gender expression, disability status, and sexually harassed her in violation of the Administrative Code of the City of New York, § 8-107 et seq.

204.    Defendants are liable under the NYCHRL as Plaintiff's "employer," and because they coerced, intimidated, threatened or interfered with, or attempted to coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment of rights granted or protected under Section 8-107 of the Administrative Code of the City of New York.

205.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

206.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

207.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL entitling Plaintiff to an award of punitive damages.

### SIXTH CAUSE OF ACTION
**Retaliation in Violation of the NYCHRL**
**(Against Everyrealm, Republic, Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, Janine Yorio, and William Kerr)**

208.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

209.    By the acts described above, Defendants retaliated against Plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Administrative Code of the City of New York, § 8-107 et seq.

210.    Defendants are liable under the NYCHRL as Plaintiff's "employer," and because they coerced, intimidated, threatened or interfered with, or attempted to coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment of rights granted or protected under Section 8-107 of the Administrative Code of the City of New York.

211.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by, inter alia, ignoring her protected complaints about the discriminatory treatment of herself and others, subjecting her to increased scrutiny and harassment, and ultimately terminating her employment.

212.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

213.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

214.    Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL, entitling Plaintiff to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### Aiding and Abetting/Inciting/Compelling/Coercing in Violation of the NYSHRL
### (Against All Defendants)

215.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

216.     Defendants Ms. Yorio, Ms. Schwartz, and Mr. Kerr knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment, and retaliation against Plaintiff in violation of the NYSHRL.

217.     As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

218.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of monetary damages and other relief.

219.     Defendants Ms. Yorio, Ms. Schwartz, and Mr. Kerr's unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**EIGTH CAUSE OF ACTION**
**Aiding and Abetting/Inciting/Compelling/Coercing in Violation of the NYCHRL**
**(Against All Defendants)**

220.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

221.     Defendants Ms. Yorio, Ms. Schwartz, and Mr. Kerr knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment, and retaliation against Plaintiff in violation of the NYCHRL.

222.     As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

223.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of monetary damages and other relief.

224.    Defendants Ms. Yorio, Ms. Schwartz, and Mr. Kerr's unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### Whistleblower Retaliation in Violation of NYLL § 740
### (Against Everyrealm, Republic, Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, Janine Yorio, and William Kerr)

225.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

226.    As detailed above, Defendant subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy, or practice of Defendant that is in violation of a law, rule, or regulation that creates a substantial and specific danger to the public health or safety, including, but not limited to, promoting the equal treatment of women in the workplace.

227.    Defendants retaliated against Plaintiff in violation of the NYLL by adversely altering the terms and conditions of her employment, eventually leading to her termination, or in the alternative her constructive discharge because she reported up the Everyrealm chain of command to redress, among other things, Defendants' unlawful employment practices under the NYLL.

228.    As a direct and proximate result of Defendant's willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted by law.

229.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for which Plaintiff is entitled to an award of punitive and/or liquidated damages.

**TENTH CAUSE OF ACTION**
**Violations of NYLL § 215**
**(Against Everyrealm, Republic, Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, Janine Yorio, and William Kerr)**

230.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

231.    Defendants retaliated against Plaintiff in violation of the NYLL by terminating her, in part, because she took sick leave to care for herself and her sick children.

232.    Defendants also retaliated against Plaintiff in violation of the NYLL by threatening to sue Plaintiff if, among other things, she did not send them or their representative her personal computer and refrain from commencing this action in court to improperly dissuade her from vindicating her rights under the New York Labor Law.

233.    As a direct and proximate result of the unlawful retaliatory conduct in violation of the NYLL, Plaintiff has suffered and continues to suffer monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

234.    As a direct and proximate result of the unlawful and discriminatory conduct in violation of the NYLL, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, and the physical manifestations thereof, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

235.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for which Plaintiff is entitled to an award of punitive damages, liquidated damages, and attorney sanctions.

## ELEVENT CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against Everyrealm, Republic, Republic Operations LLC, Opendeal Inc., Opendeal Portal LLC, and Janine Yorio)

236.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

237.    Defendant Ms. Yorio engaged in conduct toward Ms. Yost that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting her to unwanted sexually explicit discussions of Everyrealm employees' private parts and their sexual orientations, by demanding that Ms. Yost carry out her racist and ableist schemes, by making fun of employees' ADHD diagnoses to Ms. Yost while knowing that Ms. Yost suffers from ADHD herself, and taunting Ms. Yost for suffering from alcohol use disorder.

238.    These actions were taken with the intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

239.    As a direct and proximate result of Defendant Ms. Yorio's extreme and outrageous conduct, Ms. Yost has suffered severe emotional distress.

240.    Ms. Yorio's conduct was wanton, malicious, willful and/or cruel, entitling Ms. Yost to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount to be determined at trial for the following relief:

A.    a declaratory judgment that the actions, conduct, and practices of Defendants violated federal, state, and city laws;

B.    an award of economic damages;

C.       an award of compensatory damages;

D.       an award of monetary damages for mental anguish and emotional distress

E.       an award of punitive damages;

F.       an award of such interest as is allowed by law, and damages for any adverse tax

consequences stemming from an award;

G.       an award of reasonable attorneys' fees, costs, and expenses of this action;

H.       permanent equitable and injunctive relief; and

I.       such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**Dated:** August 2, 2022                                        Respectfully submitted,
New York, New York

/s/ Shane Seppinni

Shane Seppinni
Seppinni LLP
43 W 43rd St., Suite 256
New York, NY 10036
212-849-7000
shane@seppinnilaw.com

*Attorney for Plaintiff Katherine Yost*