UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHERINE YOST,

                                  Plaintiff,

               -v-

EVERYREALM, INC., COMPOUND ASSET
MANAGEMENT LLC, REALM METAVERSE REAL
ESTATE INC., REPUBLIC REALM MANAGER LLC,
REPUBLIC REALM INC., REPUBLIC, REPUBLIC
CRYPTO LLC, REPUBLIC OPERATIONS LLC,
OPENDEAL INC., OPENDEAL PORTAL LLC, JANINE
YORIO, ZACH HUNGATE, AND WILLIAM KERR,

                           Defendants.

22 Civ. 6549 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

     This case calls upon the Court to apply the recently enacted Ending Forced Arbitration of

Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA"), Pub. L. No. 117-90, 135 Stat.

26, *codified at* 9 U.S.C. §§ 401–02, which amended the Federal Arbitration Act ("FAA"), and

which President Biden signed into law on March 3, 2022.  As pertinent here, the EFAA defines a

"sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual

harassment under applicable Federal, Tribal, or State law."  9 U.S.C. § 404(4).  At the election of

a person alleging "conduct constituting a sexual harassment dispute," the EFAA makes pre-

dispute arbitration agreements unenforceable "with respect to a case which is filed under Federal,

Tribal, or State law and relates to . . . the sexual harassment dispute."  *Id.* § 402(a).

     Plaintiff Katherine Yost is a former employee of digital real estate company Everyrealm,

Inc. ("Everyrealm").  As a condition of employment, first as an independent contractor and then

as a full-time employee, Yost entered into three successive agreements with Everyrealm

containing broad mandatory arbitration provisions.  Yost now sues Everyrealm and several

officers, Janine Yorio, Zach Hungate, and William Kerr (collectively, the "Everyrealm

defendants"); and Everyrealm affiliates Republic Realm Inc., Republic, Republic Operations

LLC, OpenDeal Inc., and OpenDeal Portal LLC (the "affiliate defendants" and collectively with

the Everyrealm defendants, "defendants").

The claims in Yost's Second Amended Complaint, Dkt. 35 ("SAC"), include (1) pay

discrimination on the basis of gender, in violation of the Equal Pay Act, 29 U.S.C. §§ 206 *et seq.*;

(2) the same, in violation of New York Labor Law ("NYLL") § 194; (3) sexual harassment,

hostile work environment, and discrimination on the basis of, *inter alia*, gender, sexual

orientation, disability, and marital status in violation of the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*; (4) retaliation for opposing unlawful employment

practices and complaining about discrimination against herself and others, in violation of

NYSHRL § 296; (5) sexual harassment, hostile work environment, and discrimination on the

basis of, *inter alia*, gender, sexual orientation, disability, and marital status, in violation of the

New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-502 *et seq.*; (6)

retaliation for opposing unlawful employment practices, in violation of NYCHRL § 8-107; (7)

aiding and abetting the NYSHRL violations, above; (8) aiding and abetting the NYCHRL

violations, above; (9) whistleblower retaliation in violation of NYLL § 740; (10) termination in

retaliation for taking sick leave, in violation of NYLL § 215; (11) common-law intentional

infliction of emotional distress; (12) discrimination, sexual harassment, and retaliation in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000-e *et seq.*;

and (13) discrimination and retaliation in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12101 *et seq. See* SAC ¶¶ 192–265. These claims are brought against all defendants except Hungate, who is named in only the third, fifth, and eleventh claims.[1]

The Everyrealm defendants have moved, under the parties' arbitration agreements, to compel arbitration of Yost's claims. Yost asserts that, because the SAC includes sexual harassment claims, the arbitration agreements are unenforceable under the EFAA. She also argues that her claims are outside the scope of the agreements and that, given her personal financial situation, it would be unconscionable to apply to her a cost-shifting provision in the first two arbitration agreements. The Everyrealm defendants counter that the SAC's sexual harassment claims are implausibly pled; that these should be dismissed under Federal Rule of Civil Procedure 12(b)(6); and that the Court should compel arbitration of the remaining claims, which are within the scope of lawful arbitration provisions.

For the following reasons, the Court finds that Yost's SAC has not pled a plausible claim of sexual harassment in violation of even the NYCHRL, the most lenient of the three statutes under which Yost alleges such a claim. The Court accordingly grants Everyrealm's motion to dismiss Yost's sexual harassment claims. The Court further construes the EFAA to require that, where a party seeks to invoke the EFAA based on a claim of sexual harassment, such a claim must have been plausibly pled. Accordingly, the Court holds, the EFAA does not present any barrier to arbitration in this case.

Finally, the Court holds, Yost's remaining claims against the Everyrealm defendants all fall within the scope of her arbitration agreements with Everyrealm.

---

[1] As developed below, the SAC initially also brought the claims above against four other corporate entities. These were: Compound Asset Management LLC, Realm Metaverse Real Estate Inc., Republic Realm Manager LLC, and Republic Crypto LLC. On February 15, 2023, Yost moved, Dkt. 87, and on February 16, 2023, the Court granted, Dkt. 89, Yost's unopposed motion to voluntarily dismiss these defendants.

The Court, however, defers granting the motion to compel arbitration pending the briefing of several interrelated issues relating to the arbitration agreements. First, the parties have not briefed which of these agreements takes precedence. Second, the parties have not briefed whether Yost's claims against the affiliate defendants fall within the scope of the governing arbitration agreement(s) and thus must also be arbitrated. Third, Yost has argued that, given her financial circumstances, it would be unconscionable to apply to her a cost-splitting provision in the first two arbitration agreements. The parties have either not briefed, or not adequately briefed, a series of issues relating to that argument: (a) whether this issue is to be resolved by the Court or an arbitrator; (b) whether that provision, which does not appear in the third arbitration agreement, has been overtaken by that agreement; (c) if the cost-splitting provision applies to Yost, concretely why it would be unconscionable to apply it to her given, *inter alia*, that she stands to bear her costs in this litigation, which she has initiated; and (d) if the cost-shifting provision would be unconscionable as applied, whether the proper remedy is the narrow one of severing and not enforcing that provision, as opposed to the broad one that Yost urges of declining to compel arbitration. The Court herein sets a prompt briefing schedule on those issues and stays all other activity in this litigation pending the final resolution of the motion to compel arbitration.

## I.    Background[2]

---

[2] The following account of Yost's factual allegations is drawn from the SAC. Insofar as the threshold issue in this decision is whether the SAC plausibly states a claim of sexual harassment, the Court evaluates the adequacy of the SAC's allegations under Federal Rule of Civil Procedure 12(b)(6), accepting as true all uncontradictory factual allegations in the SAC and drawing all reasonable inferences in Yost's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also takes judicial notice of, and considers, the U.S. Securities and Exchange Commission ("SEC") filings, *see* SAC ¶ 11 n.11, and news articles and tweets, that the SAC cites, *see, e.g., id.* ¶¶ 5–10 nn.2–10. For the limited purpose of taking notice of the fact that

these public statements were made, the Court also considers the tweets and news articles cited in Yost's opposition to the motion to dismiss filed by defendants OpenDeal Inc., OpenDeal Portal LLC, and Republic Operations LLC. *See* Dkt. 64 ("Affiliate MTD Opp."). On a Rule 12(b)(6) motion to dismiss, "a court may consider matters of which judicial notice may be taken, including the *fact* that press coverage or regulatory filings contained certain information, without regard to the truth of their contents." *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (internal quotation marks, citation, and alterations omitted)).

In its Rule 12(b)(6) analysis, the Court disregards the "contemporaneous writings" of Yost's that defendants have filed. *See, e.g.*, Dkts. 39, 83–85. Defendants argue that these expose the falsity of various allegations in the SAC. *See* Dkt. 41 ("Everyrealm MTD Mem.") at 20; Dkt. 58 ("Everyrealm MTD Opp.") at 19–20 (Yost, terming these materials "factually disputed"). But, because analysis under Rule 12(b)(6) turns on the plausibility of the claims of sexual harassment as pled, the extra-SAC materials filed by defendants must be disregarded. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." (internal quotation marks omitted)); *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 193 (S.D.N.Y. 2019) ("[A]ffidavits or exhibits that go beyond the Complaint may not be considered on a Rule 12(b)(6) motion" and "[t]o the extent that defendants' submissions rely on documents that raise factual challenges to the allegations of the Complaint, such arguments are not properly considered on a Rule 12(b)(6) motion").

For the same reason, the Court disregards factual allegations Yost makes for the first time in connection with opposing the affiliate defendants' motion to dismiss, which, in any event, the Court does not have a charter to resolve pending resolution of the motion to compel arbitration. *See* Dkts. 65–66 & Ex. A; *see, e.g.*, *Atl. Neurosurgical Specialists, P.A. v. Multiplan, Inc.*, No. 20 Civ. 10685 (LLS), 2022 WL 158658, at *4 (S.D.N.Y. Jan. 18, 2022) (refusing to consider new facts raised in opposition to motion to dismiss); *Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 527 (S.D.N.Y. 2015) (same); *Universal Trading & Inv. Co. v. Tymoshenko*, No. 11 Civ. 7877 (PAC), 2012 WL 6186471, at *1 (S.D.N.Y. Dec. 12, 2012) (same); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 Civ. 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) (same).

Insofar as this decision also resolves a motion to compel arbitration, courts in this Circuit typically evaluate such motions under standards similar to those for motions for summary judgment. *See Barrows v. Brinker Restaurant Corp.*, 36 F.4th 45, 49 (2d Cir. 2022). Courts consider all relevant evidence supplied by the parties, and draw reasonable inferences in favor of the non-moving party. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017). Given the limited issues relating to those agreements that are resolved in this decision, no material disputes of fact are implicated. The content and date of Yost's successive employment agreements with Everyrealm are undisputed. *See* Dkts. 20-1 ("Independent Contractor Agreement"); 12-2 ("Employee Agreement"); 79, Ex. A ("Worksite Employee Agreement"). And these, on their faces, compel arbitration of Yost's claims against the Everyrealm defendants. The Court in this

The SAC makes many factual allegations in support of its claims. In light of the narrow issue under the EFAA that the pending motion to compel arbitration presents and on which this decision centers, the following summary is focused on the allegations germane to the SAC's claims of sexual harassment. The Court recounts other allegations as context and to illuminate the SAC's other claims. The Court rejects Everyrealm's argument that, because the factual allegations on which the SAC's sexual harassment claims rest were generally not included in Yost's initial Complaint, Dkt. 1, the Court must disregard these allegations.[3]

---

decision does not reach the other issues implicating the agreements, including whether they cover Yost's claims against the affiliate defendants; whether Yost's as-applied challenge to the cost-shifting provision in the first two agreements on grounds of unconscionability has merit; and if so, what the proper remedy would be. The Court also has no occasion to determine here whether any of these issues may implicate disputes of material fact.

[3] Certain allegations the SAC alleges in support of its sexual harassment claims under the NYSHRL and NYCHRL were indeed absent from the initial Complaint. Everyrealm argues that the Court should disregard these as "fabrications" because they (1) were added as a ploy to avoid arbitration and (2) contradict Yost's earlier pleadings. Everyrealm MTD Mem. at 1. Such relief is unwarranted.

As to defendants' first point, the Court, as explained above, must treat plaintiff's factual pleadings as true. At an appropriate time, presumably after discovery, defendants will be at liberty to argue—in the forum in which this case ultimately proceeds—that facts alleged by Yost have been proven untrue. If such is established, defendants may seek appropriate relief.

As to defendants' second point, the factual allegations added by the SAC do not contradict the initial Complaint. "Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and *directly contradicts* the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true." *Vasquez v. Reilly*, No. 15 Civ. 9528 (KMK), 2017 WL 946306, at *3 (S.D.N.Y. Mar. 9, 2017) (emphasis added) (internal alterations, quotation marks, and citation omitted). And where an initial pleading's factual allegations preclude relief, a plaintiff may be held to them despite deleting them from a successor complaint. *See, e.g.*, *Underwood v. Coinbase Glob., Inc.*, No. 21 Civ. 8353 (PAE), 2023 U.S. Dist. LEXIS 17201, at *17–19 (S.D.N.Y. Feb. 1, 2023) (collecting cases). "Where, however, an amended pleading is not in 'direct' contradiction with the original pleading, courts apply the general rule recognizing that an amended pleading completely replaces the original pleading." *Brooks v. 1st Precinct Police Dep't*, No. 11 Civ. 6070 (MKB), 2014 WL 1875037, at *3 (E.D.N.Y. May 9, 2014). Such is the case here. The SAC does not squarely contradict any facts pled in the initial Complaint, including as to its allegations in

### A.    Factual Background

#### 1.  The Parties

Everyrealm is a digital real estate company with a principal place of business in New York, New York.  SAC ¶¶ 1, 27.  It acts as a contractor and/or agent to public companies and is regulated by the SEC.  *Id.* ¶ 27 & n.16.  It is an affiliate of defendant Republic, which, as Everyrealm's parent, retains control over Everyrealm's day-to-day operations and Board of Directors.  *Id.* ¶¶ 10–11 & nn.9–11, 30.

Republic is an alternative asset crowdfunding company.  *Id.* ¶ 30; *see also* Affiliate MTD Opp. at 2–4 (citing tweets from @joinrepublic and @Everyrealm describing Republic).  Realm Metaverse Real Estate Inc. and Compound Asset Management, LLC are subsidiaries or alter egos of Everyrealm and/or Republic.  *Id.* ¶¶ 28–29.  "Republic" is also the trade name of Republic Operations LLC, OpenDeal Inc., OpenDeal Portal LLC, Republic Realm Manager LLC, and Republic Crypto LLC.  *Id.* ¶¶ 31–35.[4]  The SAC's allegations as to Republic encompass all the above entities.  *Id.* ¶ 30.

---

support of its sexual harassment claims under the NYSHRL and the NYCHRL.  *See Frey v. Pekoske*, No. 18 Civ. 7088 (CS), 2021 WL 1565380, at *10 (S.D.N.Y. Apr. 21, 2021) (no direct contradiction where fourth complaint alleged a second off-camera search occurred, even after three earlier complaints and pleadings alleged only one search); *id.* (challenge to new allegations was "the stuff of fact-finding, not a motion to dismiss").  Indeed, the initial Complaint, although not bringing claims of sexual harassment, made factual allegations to this effect under the header, "Ms. Yorio Repeatedly Sexually Harasses Ms. Yost."  *See* Dkt. 1 ¶¶ 95–105.  The SAC reprises these allegations.  *See* SAC ¶¶ 61–71.

[4] An SEC filing represented that "the beneficial owner of a majority of the limited liability company interests in Republic Realm Manager, LLC is Republic Realm Inc., a wholly owned subsidiary of OpenDeal Inc. dba Republic."  *See* Realm Metaverse Real Estate Inc., Preliminary Offering Circular, Oct. 15, 2021, https://www.sec.gov/Archives/edgar/data/1854001/000149315221025595/filename2.htm (cited at Affiliate MTD Opp. at 1 n.2).  A later SEC filing represented that "the beneficial owner of a majority of the limited liability company interests in Republic Realm Manager, LLC is

Yorio is Everyrealm's CEO and a member of its board of directors. *Id.* ¶¶ 1, 36. Kerr is Everyrealm's general counsel. *Id.* ¶ 37. Hungate is an Everyrealm employee. *Id.* ¶ 38. Yost, a Maryland resident, is a single parent, the primary caretaker of her three children, openly bisexual, and disabled. *Id.* ¶¶ 21, 40.

### 2. Everyrealm Hires Yost

In November 2021, Yorio posted on Facebook that Everyrealm was seeking a human resources ("HR") professional. *Id.* ¶ 50. Yost was an experienced HR professional, with a degree in business administration and decades of HR experience, and is the owner of an HR consulting firm. *Id.* ¶ 51. Yost contacted Yorio, whom she had known in high school, and offered her firm's services to Everyrealm. *Id.* ¶¶ 48, 51–52. Yorio hired Yost. *Id.* ¶ 53.

For the first six weeks of her employment, Yost worked, on an independent contractor basis, as Everyrealm's external chief HR officer. *Id.* At the time, Everyrealm was called "Republic Realm." *Id.* Yost handled all HR matters, including candidate interviews and proposing and implementing company-wide HR policies. *Id.* ¶ 54. As Everyrealm quickly grew, "the demands on [Yost] grew to the point that her work for Everyrealm encroached on the time she had promised other clients." *Id.* ¶ 55. Yost told Yorio she would either need a full-time position or to put "hard limits on the time she spent working for Everyrealm." *Id.* ¶ 56. Yorio offered Yost a full-time position. *Id.* ¶ 57. Yost received an official offer on Republic Realm letterhead. *Id.* ¶ 58.

---

Everyrealm Inc., an entity associated with OpenDeal Inc. dba Republic." *See* Everyrealm/Realm Metaverse Real Estate Inc. Preliminary Offering Circular, Mar. 25, 2022, https://www.sec.gov/Archives/edgar/data/1854001/000149315222007846/partiiandiii.htm#a_00 9 (cited at SAC ¶ n.11).

On December 21, 2021, Yost signed an independent contractor agreement with Everyrealm's predecessor, Republic Realm, Inc., in which the parties agreed to arbitrate "any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement." Dkt. 20 ("Independent Contractor Agreement"). On January 21, 2022, Yost signed an employment agreement with Republic Realm, Inc., which contained a substantially identical provision. Dkt. 12-2 ("Employment Agreement"). On January 24, 2022, Yost signed a third agreement—her second as an employee—with Republic Realm, Inc., and Justworks Employment Group, LLC, Everyrealm's "outsourced provider of certain human resources support." *See* Dkt. 79-1 ("Worksite Employee Agreement"). This agreement came to light after briefing on this motion was complete. It states that "arbitration [i]s the sole and exclusive means to resolve all disputes that may arise between you and Worksite Employer [Republic Realm Inc.] and/or you and Justworks, including, but not limited to, disputes regarding termination of employment and compensation." *Id.*; *see infra* Section III (more fully quoting agreements).[5]

### 3. Yorio Targets Yost's Bisexuality and Makes Sexually Explicit Comments

While employed at Everyrealm, Yost was "the target of and witness to sexually offensive remarks and jokes, comments, and questions regarding others' sex lives" and "was subject to sexually explicit rants and tirades at work." SAC ¶ 59. Yorio "frequently discussed her theories about the sexuality of other Everyrealm employees in the office with [Yost]," *id.* ¶ 61, who did not welcome such commentary, *id.* ¶ 62. Yorio specifically targeted Yost with such comments

---

[5] The SAC does not allege the date on which Yost was hired as an employee, but her employment agreement, which is cognizable, is dated January 21, 2022. On January 24, 2023, after the pending motions had been fully briefed, defendants notified the Court that they had uncovered the Worksite Employee Agreement, containing the third arbitration provision. *See* Dkt. 79, Ex. A.

because Yost is openly bisexual, and Yorio "thought that this attribute made [Yost] an expert on others' sexual orientations." *Id.* ¶ 63.

The SAC alleges several instances of such comments, to which it does not attach dates. Yorio "cornered [Yost] and told her that she believed a senior executive at Everyrealm was 'in the closet,' and implied that she was interested in [Yost's] opinion on the matter." *Id.* ¶ 64. Yost found such speculation harassing and inappropriate. *Id.* ¶ 65. Another time, Yorio repeated to Yost that an employee she "think[s] is in the closet" had said at a company celebration in New York "that another employee's 'balls will be in [his or her] mouth by the end of the night.'" *Id.* ¶ 66 (alterations in original). Yost was "appalled" and "stunned into silence." *Id.* ¶ 67. On another occasion, Yorio "insist[ed] that a cofounder of the company is a 'virgin'" and speculated as to "if he or she was aware that he or she is 'an asexual or bisexual.'" *Id.* ¶ 69. Yorio stated that "she [had] developed these sexual theories about [her] cofounder after trying to set him or her up with 'pretty girls all the time,'" to which the cofounder appeared uninterested. *Id.* ¶ 70. Yorio told Yost that this cofounder "can't manage [his or her] way out of a paper bag." *Id.* ¶ 71 (alterations in original). Yost ignored Yorio's comment and offered to "take on an increased role at Everyrealm if the person at issue was not fulfilling their duties." *Id.* Instead, Yorio instructed Yost to give the cofounder a raise to a salary of $230,000. *Id.* ¶ 72.

The SAC also alleges other comments by Yorio relating to sexual matters. At some point after March 20, 2022, Yorio recounted asking a male coworker, Teyo Johnson, whether he was late "because he had 'hooked up' with a woman whom [Yorio] referred to as 'Dog in Bag.'" *Id.* ¶ 77. Johnson responded, "No, she was on her period." *Id.* When Yorio recounted this, Yost responded, "Why did you ask him that?!" *Id.* ¶ 78. Yorio "back-peddled," and "suggested that [Johnson had] walked into the office and offered up this detail to her unprompted." *Id.* ¶ 79. In

10

May or June 2022, while Yost was in Everyrealm's New York City office, Yorio, "out of the blue" told Yost "there was a rumor that employees named Rachel and Michael were sleeping together." *Id.* ¶ 73. Yost responded that "this rumor is none of her concern if it is 'not affecting their work,'" *id.* ¶ 74, and regarded the rumor as "inappropriate gossip," *id.* ¶ 75. Yost "did not welcome these sex-related conversations." *Id.* ¶ 80.

### 4. Yorio and Kerr's Disability-Related Comments

Yost suffers from attention deficit hyperactivity ("ADHD"), *id.* ¶ 96, and alcohol-use disorders, *id.* ¶ 159, conditions she had disclosed to Yorio. *Id.* ¶¶ 96, 159. In June 2022, Yost witnessed Yorio and Kerr "disrespecting an employee who suffered from dyslexia and . . . ADHD" by referring to the employee as "a 'moron' and an 'idiot' for allegedly ordering an incorrect amount of office snacks." *Id.* ¶ 98. Yost pulled Yorio aside and told her it was inappropriate to mock disabled employees. *Id.* ¶ 99. Yorio "became irate and continued to mock the employee in front of between six and eight other Everyrealm employees," and "yelled that the disabled employee was 'stupid.'" *Id.*

The next day, Yost met with Kerr, her manager. *Id.* ¶ 100. Kerr had been away from the office for a few hours; Yost "noticed alcohol on [his] breath" and believed he was intoxicated. *Id.* Yost shared "the same feedback" with Kerr as she had with Yorio—that "as a leader at Everyrealm it is important that you do not play into [Yorio's] misbehavior, especially around young impressionable employees who don't have the experience in the workplace that you and I do." *Id.* Kerr responded: "You know Janine. She's gonna' do what she's gonna' do." *Id.* ¶ 101. Yost returned to her desk. *Id.* ¶ 102.

In another incident in Everyrealm's New York City office, Yorio showed Yost an email in which an Everyrealm manager "mockingly referred to an employee diagnosed with autism

spectrum disorder ("ASD") and ADHD as 'The Team Mascot' in a communication with [Yorio]." *Id.* ¶ 104. Instead of reprimanding the manager, Yorio instructed Yost to "[p]ut The Mascot on a 30-day performance plan." *Id.* ¶ 105. Yost refused to do so, understanding "Mascot" as "a derogatory nickname used to mock this employee's disabilities." *Id.* Also in the New York City office, Yorio referred to a female executive as a "neurotic anorexic" in front of other employees and Yost. *Id.* ¶ 106. Yost "again made clear her discomfort with [Yorio's] use of ableist disparaging language to describe her co-worker." *Id.* ¶ 107.

At an Everyrealm event in New York City, Yorio "taunt[ed]" Yost about her alcohol use disorder in front of Everyrealm employees, *id.* ¶ 159, and pressured her to drink, *id.* ¶ 162. When Yost arrived at an Everyrealm event where alcohol was being served, Yorio shouted, "We need to get [Yost] SIX drinks!" *Id.* ¶ 160. Yost, shocked, replied, "Uh, no, I'll have a club soda." *Id.* ¶ 161. On another occasion, Yorio "attempted to gossip with [Yost] about what she perceived as an employee's cocaine addiction." *Id.* ¶ 163. Yost asked whether the employee's cocaine use was "something interfering with this person's job, or [if] she need[ed] to be concerned for safety or health reasons." *Id.* ¶ 164. Yorio "backtracked" and replied that "every time she parties with the employee he 'pulls out cocaine' so she 'assume[s] he's an addict.'" *Id.* ¶ 165 (alterations in original). Yost "understood [Yorio] to have used the term 'addict' as a derogatory smear because she knew it would upset [Yost]." *Id.* ¶ 166. Yorio was aware at the time that Yost was receiving substance use treatment. *Id.* ¶ 167.

Yorio stated in a performance review of Yost that "[t]he feedback I receive about you is so uniformly positive and basically all in this vein: 'At first I thought she was too different, but now I get it, and she's fantastic.' Keep it up. We need you." *Id.* ¶ 92. Yost viewed "too different" as a "thinly veiled euphemistic insult for [her] disclosed disabilities, her open

bisexuality, and her status as perhaps Everyrealm's only single mother, among other protected attributes." *Id.* ¶ 93.

### 5. Yorio Makes Racially Discriminatory Comments

"Yorio and other Everyrealm employees relentlessly focused on race in the hiring process at Everyrealm." *Id.* ¶ 108. After an interview, Yorio described a candidate as "the whitest Black guy I've ever met." *Id.* ¶ 110. Yost responded, "Hey, we don't say that." *Id.* ¶ 111. Yorio replied, "No, I mean it in a good way." *Id.* ¶ 112. Yost said, "There is no good way," *id.* ¶ 113, and "attempted to move on by stating 'Look, it's learning. We all learn,'" *id.* ¶ 114. Yorio "took [Yost's] feedback as a slight and retaliated against her by yelling . . . to justify her remarks." *Id.*

Yost sent Yorio an article on "Code Switching"; there was "no indication that [Yorio] read [it]." *Id.* ¶¶ 115–16. Yorio also declined an applicant's request for an additional $10,000 in salary stating, "More base is out of the question. We are not a charity." *Id.* ¶¶ 117, 119. The candidate was of Indian descent and had been adopted as a child. *Id.* ¶ 118.

### 6. Yost Is Paid Less than Her Male Peers and Denied Promotions

Defendants offered Yost $140,000 in base salary and a discretionary $25,000 bonus, but no equity. *Id.* ¶ 82. Yost later "learned that Everyrealm paid male employees with less experience in similarly leveled roles who had similar responsibilities over $100,000 more in base salary and millions of dollars in Everyrealm equity." *Id.* ¶ 83. When Yost attempted to negotiate her salary—citing that men of less experience and education were paid substantially more for similar or lower-level work—Yorio promised "she would 'take care of [Yost]' and raise her salary once certain male employees got raises first." *Id.* ¶ 84. In May 2022 in the company's New York City office, Yorio told Yost that, because "all the men here are castrated," "she did

not want to do anything to make the men at Everyrealm 'feel more castrated.'" *Id.* ¶ 85.  Once

"the men whose salaries [Yorio] would not allow to fall below that of [Yost's] were raised,"

Yost received a 14.29% raise—but that raise "was among the three lowest raises at the company

during that compensation cycle." *Id.* ¶ 90.  Yost's salary "never met or exceeded her male

counterparts' salaries." *Id.*

### 7. Hungate Intimidates Yost

In an incident in Everyrealm's New York City office, Hungate "intimidated and harassed

[Yost] in other [d]efendants' presence." *Id.* ¶ 130.  The incident began when Hungate

approached Yost, Yorio, and another employee and showed Yorio his phone screen. *Id.* ¶ 131.

After looking at the screen, Yorio shrugged and said, "show it to [Yost], see what she says." *Id.*

Hungate blurted, "I want her gone, Lea has to go," and "crept uncomfortably close to [Yost's]

face and showed her his phone." *Id.* ¶ 132.  Yost "lean[ed] back in her seat to create space." *Id.*

¶ 133.  Hungate showed Yost a screenshot of a text message exchange with the employee that

included roughly five messages. *Id.* ¶¶ 134–35.  One asked, "Did [Hungate] get lip fillers?" *Id.*

¶ 135.  The other employee replied, "[N]ot sure." *Id.*  Hungate had been removed the week prior

as the employee's manager. *Id.* ¶ 141.  Yost asked Hungate how he had obtained these

messages. *Id.* ¶ 136.  Hungate said the recipient had sent the screenshot to him. *Id.*

After reviewing the messages, Yost told Hungate that nothing in the messages suggested

the at-issue employee was not doing her job, but that "if [Hungate was] feeling harassed

regarding her discussion of [his] physical appearance, [Yost] would be happy to speak with [the

employee]." *Id.* ¶ 137.  Yost stood up from her seat "because [Hungate] was looming over her

menacingly." *Id.* ¶ 138.  As she stood, Hungate "became irate at [Yost] and yelled, 'No, she

can't know we have a mole!'" *Id.* Yost was shocked, *id.* ¶ 139, and believed Hungate was "encouraging employees to spy on women at Everyrealm," *id.* ¶ 140.

Yost said to Hungate, "You want me to fire her, but I can't say why?" *Id.* ¶ 142. Hungate responded, "You don't have to tell her why." *Id.* ¶ 143. Hungate and Yorio both stated that they had never spoken to the at-issue employee about performance issues or inappropriate conversations. *Id.* ¶¶ 144–45. Hungate "took an aggressive step toward [Yost] and yelled harassingly, 'You're being ridiculous and she fucking sucks.'" *Id.* ¶ 146. Neither Yorio, *id.* ¶ 147, nor Kerr, who had been "nodding off on a couch nearby," *id.* ¶ 150, intervened. Yost stated that, because Hungate was no longer the employee's manager, he should "let the manager that's overseeing her now assess her job performance." *Id.* ¶ 148. Yost "collected her things and prepared to walk away." *Id.* ¶ 149. Another Everyrealm employee, "sensing [Hungate's] threatening demeanor and seeing that [Yost] was upset, offered to walk her out." *Id.*

Yost spoke to Kerr about the interaction the next morning. *Id.* ¶ 154. Kerr "began with, 'Sorry, I usually don't have more than two drinks. I heard what happened.'" *Id.* Yost asked Kerr "what [he] was going to do about it." *Id.* ¶ 155. Kerr laughed. *Id.* ¶ 156. Yost responded, "I don't want [Hungate] anywhere near me again." *Id.* ¶ 157.

### 8. Everyrealm Retaliates Against Yost

On or about June 19, 2022, Yost and two of her three children were diagnosed with COVID-19. *Id.* ¶ 168. Yost told Yorio and Everyrealm's executive team that she was unable to make a scheduled trip to Everyrealm's New York office, but would continue to check her work email. *Id.* ¶ 169.

A couple days into Yost's sick and caregiver leave, Yorio and Kerr "became concerned that employees, including [Yost], were abusing Everyrealm's leave policies by taking time off to

care for themselves and their loved ones." *Id.* ¶ 170. Yorio, Kerr, "and their teams wrote a slapdash two-tiered vacation policy, a reduced sick-leave policy, and a restrictive remote work policy." *Id.* ¶ 171. These policies "required female-dominant roles to work in the office and limited women's vacation and sick-time, while Everyrealm would offer employees in male-dominated roles like engineering unlimited leave and vacation, and the men could work from home." *Id.* ¶ 172.

Despite knowing that Yost was on sick and caregiver leave, Yorio sent Yost a "barrage of notifications" after 10 p.m. on a Saturday night regarding the "urgent" proposed policy change that she expected Yost to review. *Id.* ¶ 173. Although "ill and exhausted, [Yost] complied and left thoughtful comments in the policy document." *Id.* ¶ 174. Yost told Yorio the proposed policies were illegal and discriminatory, and that "it was not an HR best-practice for the company to use certain gendered language like 'grandfathered' in company-wide policies." *Id.* ¶ 175. Before going to bed that evening, Yost wrote to Kerr that if Yorio went ahead with the proposed policy change, "Yost '[would not] be staying on board.'" *Id.* ¶ 176 (alterations in original). "If [Yorio] cuts off my access please text me so I know what to expect," Yost wrote. *Id.* ¶ 177. Yost added: "I've also alerted her to the discriminatory nature of the draft policy and language within it and advised her not to use it." *Id.* Yost ended her message to Kerr with: "Did this policy have something to do with my being out last week for Covid-19? I was supposed to be in New York now so I guess I get it." *Id.*

By the next morning, Everyrealm had revoked Yost's access to all company platforms. *Id.* ¶ 178. On June 26, 2022, Yost emailed Kerr. *Id.* ¶ 179. She reported that, when "[she] informed [Yorio] that allowing the engineering subgroup to have access to a special set of benefits is creating adverse impact because it is discriminatory against women," Yorio had

replied to Yost, "I'm not making this about gender." *Id.* Yost told Kerr that "the policy clearly outlines a discriminatory practice." *Id.* ¶ 180. Yost asked Kerr, "why [was] my technology so abruptly cut off and what [] should [I] expect in terms of next steps in communication"? *Id.* ¶ 181 (alterations in original). Kerr did not respond. *Id.* ¶ 182.

Two days later, on June 28, 2022, Yost emailed Kerr again. *Id.* "[L]et me make myself clear that while I did tell [Yorio] that I would not administer any policy that I found to be discriminatory or non-compliant, at no time did I resign from my position." *Id.* Yost stated that she "[could not] afford to leave my position without another prospect," but that "[b]eing asked to do something illegal or unethical is not a choice." *Id.*

Later that day, Kerr responded to Yost that he had begun an investigation into her allegations. *Id.* ¶ 183. However, on June 29, 2022, Kerr replied again that a "letter confirming [Yost's] resignation" was enclosed. *Id.* ¶ 184.

Yost replied, copying Everyrealm's chief financial officer James Goede and board member Julia Schwartz. *Id.* ¶ 185. Yost wrote that she "stated numerous times that [she] did not resign," but rather "objected to [Yorio's] continued indifference regarding my feedback about the policy she intends to implement. The policy was non-compliant and discriminatory." *Id.* (internal alteration omitted). Refusing to carry out a discriminatory policy, Yost stated, is not a resignation of employment. *Id.*

Everyrealm did not offer Yost any COBRA payment "even though [it] knew that (1) she was out on protected sick leave and caregiver leave when it terminated her without notice and (2) that [Yost] relied on Everyrealm's insurance plan for her substance use treatment among other necessities." *Id.* ¶ 188. Yost has since had to fund her and her children's medical expenses out-

of-pocket. *Id.* ¶ 189. She has been forced to go without medical care and has suffered physical side effects from emotional distress relating to her termination. *Id.* ¶ 191.

Yost alleges that defendants terminated her in retaliation for her refusal to implement "plainly illegal, retaliatory, and discriminatory personnel policies that made women and other protected groups second-class employees at Everyrealm." *Id.* ¶ 22.

### B.    Procedural Background

On August 2, 2022, Yost filed the initial Complaint. Dkt. 1. On August 4, 2022, Yost filed an Amended Complaint. Dkt. 4 ("AC").

On August 12, 2022, defendants moved to compel arbitration under Yost's January 24, 2022 employment agreement. Dkt. 9. In support, they filed a memorandum of law, Dkt. 10 ("MTC Mem."), and declarations, Dkts. 11–12. On August 15, 2022, the Court set a briefing schedule. Dkt. 14. On September 6, 2022, Yost opposed arbitration, Dkt. 15 ("MTC Opp."), and filed declarations in support, Dkts. 16–17. On September 9, 2022, defendants replied, Dkt. 18 ("MTC Reply"), and filed a declaration in support, Dkt. 19.[6] On September 14, 2022, Yost requested leave to file a surreply, Dkt. 21, which defendants opposed, Dkt. 22. On September 16, 2022, the Court granted Yost's request, Dkt. 23. On September 22, 2022, Yost filed a surreply, Dkt. 24, and a declaration, Dkt. 25.

On September 27, 2022, Yost moved for emergency relief to enjoin the arbitration that, Yost stated, defendants had—without notice to the Court—initiated on September 12, 2022. Dkt. 28. In support, Yost filed a memorandum of law and declaration. Dkts. 29–30. On September 28, 2022, defendants filed a letter objecting to Yost's failure to confer with them before seeking emergency relief. Dkt. 31. Defendants represented that Yost had been on notice

---

[6] On September 12, 2022, correcting a filing error, defendants refiled one declaration. Dkt. 20.

of the arbitration since September 1, 2022—11 days earlier than the date Yost had represented to the Court. *Id.*

The same day, the Court directed defendants to file a response to Yost's motion for emergency relief, and scheduled a hearing to address the motion and parallel developments in *Johnson v. Everyrealm*, No. 22 Civ. 6669, a lawsuit brought by another Everyrealm employee represented by the same counsel as Yost and as to which Everyrealm also sought to compel arbitration.[7] Dkt. 32. On October 3, 2022, defendants responded. Dkt. 33.

On October 6, 2022, the Court held the hearing. The Court determined that, under the EFAA, 9 U.S.C. § 402(b), it was required, at the threshold, to resolve the arbitrability of Yost's claims. Dkt. 34. The Court ordered focused briefing on whether the EFAA applied to Yost's claims and if so, with what effect. To assure that Yost's basis for claiming to have brought a sexual harassment dispute within the EFAA was fully developed in advance of the parties' briefing, the Court authorized Yost to file an amended complaint that would fully set out the facts in support of her claims of sexual harassment. *Id.*[8] The Court also directed defense counsel to notify the American Arbitration Association that no further progress was to be made in the arbitral proceeding initiated by Everyrealm, unless and until the Court had held that such an arbitration could proceed consistent with the EFAA, and that Yost did not have a duty to appear or participate in the arbitration while the motion to compel was pending before this Court. *Id.*

---

[7] This case and *Johnson* were not filed as related. They were, coincidentally, both assigned to this Court.

[8] The Court clarified that Yost—after the Court resolved the motion to compel arbitration—would have the opportunity to move to amend her complaint as to all other claims, and defendants would have an opportunity to oppose that motion and/or move to dismiss under Rule 12(b). Dkt. 34.

On October 14, 2022, Yost filed the SAC.  It added, to the AC's third and fifth claims, claims of a hostile work environment and sexual harassment.  It also added the 12th claim, for violations of Title VII, and the 13th, for violations of the ADA.

On November 2, 2022, defendants moved to dismiss the SAC, Dkt. 40, and filed a supporting memorandum of law, Everyrealm MTD Mem., and declarations, Dkts. 38–39.  On November 16, 2022, the affiliate defendants filed a motion to dismiss, Dkt. 55, and a memorandum of law in support, Dkt. 56 ("Affiliate MTD Mem.").  On November 16, 2022, Yost opposed Everyrealm's motion to dismiss, Everyrealm MTD Opp., and filed a declaration in support, Dkt. 59.  On November 22, 2022, Public Justice requested leave to file an amicus brief on behalf of itself, the American Association for Justice, the National Women's Law Center, the National Employment Lawyers Association, Rape, Abuse & Incest National Network, Rise, and Lift Our Voices (collectively, "amici"), Dkt. 62, which the Court granted the same day, Dkt. 63.  On November 30, 2022, Yost opposed the affiliate defendants' motion to dismiss, Affiliate MTD Opp., and filed declarations in support, Dkts. 65–66.  On December 7, 2022, amici filed a brief in support of Yost.  Dkt. 71 ("Amici Br.").  On December 7, 2022, the affiliate defendants replied. Dkt. 72 ("Affiliate MTD Reply").  On December 16, 2022, the Everyrealm defendants replied. Dkt. 78 ("Everyrealm MTD Reply").

On February 13, 2023, the Court ordered Yost to show cause for her failure to serve four defendants: Republic Crypto LLC, Compound Asset Management LLC, Realm Metaverse Real Estate Inc., and Republic Realm Manager LLC.  Dkt. 81.  On February 15, 2023, Yost moved for

the voluntary dismissal of these defendants. Dkt. 87. On February 16, 2023, the Court approved

the voluntary dismissal. Dkt. 89.[9]

## II.    Arbitrability of Yost's Claims

Defendants move to compel arbitration of all claims in the SAC, based on the mandatory

arbitration provision in Yost's independent contractor and employment agreements. Yost

opposes the motion predominantly on the ground that, because the SAC alleges sexual

harassment, the EFAA makes the arbitration agreements unenforceable in this case. The Court's

analysis is in three parts.

First, the Court examines whether the SAC states a plausible claim of sexual harassment

under any of the three statutes (Title VII, the NYSHRL, and the NYCHRL) under which such

claims are pled. The Court holds that it does not. The Court accordingly dismisses these claims

under Rule 12(b)(6).

Second, the Court examines whether the EFAA applies where the only bases for invoking

the EFAA are claims of sexual harassment that have been found implausibly pled. The Court

holds that it does not. The EFAA thus does not present any barrier to the motion to compel

arbitration here.

Third, the Court identifies issues specific to the arbitration agreements here that are in

need of further briefing. These include which agreement controls; whether the SAC's claims

against the affiliate defendants fall within the operative arbitration agreement; and whether

Yost's challenge on grounds of unconscionability to a cost-shifting provision in the first two

---

[9] On February 14, 2023, the Everyrealm defendants moved for sanctions, Dkt. 82, and filed a
memorandum of law, Dkt. 83, and declarations in support, Dkts. 84–85. On February 15, 2023,
the Court denied the motion as premature, pending resolution of the motion to compel
arbitration, without prejudice to defendants' right later to pursue such relief. Dkt. 88.

agreements is moot; if not, whether that challenge is meritorious; and if so, what remedy is proper.

### A.    Does the SAC Plausibly Plead a Claim of Sexual Harassment?

The Court considers first whether the SAC pleads a viable claim of sexual harassment. All parties agree—or appear to agree—that if it does, the EFAA applies to this lawsuit. In the companion case of *Johnson v. Everyrealm*, No. 22 Civ. 6669 (PAE) (S.D.N.Y. Feb. 24, 2023) (citation forthcoming), the Court has found a viably pled such claim, under the NYCHRL. The Court accordingly, applying the text of the EFAA, has held the entire "case," 9 U.S.C. § 402(a), filed by Johnson containing this claim to be exempt from compulsory arbitration. Yost's SAC, however, involves distinct (and fewer) factual allegations relevant to the sexual harassment claim than did Johnson's operative pleading, and must be evaluated independently.

### 1.    Standards for Motions Under Rule 12(b)(6)

In evaluating the plausibility of the SAC's sexual harassment claims, the Court applies familiar standards. To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action will not do."
*Twombly*, 550 U.S. at 555.

### 2.    Standards for Sexual Harassment Claims Under the NYCHRL

Although the SAC brings sexual harassment claims under Title VII, the NYSHRL, and
the NYCHRL, the Court's focus here is on the NYCHRL claim. That is because the NYCHRL's
standards of liability are lower than those of Title VII, and lower than, or equal to, those of the
NYSHRL.

The NYCHRL's liability standards are more lenient than those of Title VII, and
historically have been lower than those of the NYSHRL, whose standards until recently had been
keyed to Title VII's more demanding standards. As pertinent here, to establish a hostile work
environment under Title VII required a showing of "severe and pervasive" conduct. *See
Williams v. N.Y.C. Hous. Auth., et al.*, No. 21-1527, slip op. at 24–25 (2d Cir. Feb. 23, 2023);
*McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 66 (S.D.N.Y. 2020). An amendment
to the NYSHRL, effective October 11, 2019, has put in place a more lenient standard of liability
that has been likened to that of the NYCHRL. *See Mondelo v. Quinn, Emanuel, Urquhart &
Sullivan, LLP*, No. 21 Civ. 02512 (CM), 2022 WL 524551, at *9 (S.D.N.Y. Feb. 22, 2022)
(amendment removed "severe and pervasive" requirement). The amended NYSHRL applies to
the claims in this case, which postdate the effective date of the amendment. *See id.*; *cf. Wellner
v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug.
29, 2019) (amendments do not apply to conduct predating amendment's effective date). The
amended NYSHRL, like the NYCHRL, is to be construed "liberally for the accomplishment of
the remedial purposes thereof, regardless of whether federal civil rights laws including those
laws with provisions worded comparably to the provisions of [the NYSHRL] have been so

23

construed." *McHenry*, 510 F. Supp. 3d at 68 (alteration in original) (citing N.Y. Exec. Law.

§ 300). The case law, however, has not definitively resolved whether the effect of the 2019

amendment is to make the NYSHRL's standard *identical* to that of the NYCHRL—or merely

closer to it. *Compare Syeed v. Bloomberg L.P.*, No. 20 Civ. 7464 (GHW), 2022 WL 3447987, at

*6 (S.D.N.Y. Aug. 17, 2022) ("[A]fter that amendment, the standard for NYSHRL aligns with

the NYCHRL standard for claims that accrued on or after October 11, 2019."), *with Wellner*,

2019 WL 4081898, at *5 n.4 (amendment brings NYSHRL "closer to" NYCHRL standard).

Therefore, the Court here applies the NYCHRL, because the NYCHRL supplies the—or tied

with the NYSHRL for the—most lenient applicable liability standard.[10]

---

[10] The EFAA applies to "conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." Although the term "State law" is undefined, the Court reads that term to encompass local (for example, municipal) laws barring sexual harassment such as the NYCHRL. The EFAA does not contain any indication that Congress, by this formulation, intended to exclude such laws. And, where Congress has defined "state" elsewhere, it has done so broadly as including states' subdivisions. *See, e.g.*, Armed Forces Act of 1959, 10 U.S.C. § 2232(1) (1983); Consumer Credit Protection Act, 15 U.S.C. §§ 1692a(8), 1693a(10) (1982); Natural Gas Policy Act of 1978, 15 U.S.C. § 3316(b)(2)(C)(i) (1982), *repealed by* Pub. L. 101-60, § 2(b), 103 Stat. 158 (July 26, 1989); Organized Crime Control (RICO) Act of 1970, 18 U.S.C. § 1961(2) (1984); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(c)(1)–(2) (1975) ("State law" includes all "laws . . . or other State action," and "State," in turn, includes "a State any political subdivisions thereof."); Act of August 31, 1954, Pub. L. No. 83–738, 30 U.S.C. § 552(18) (1971); Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601(2) (1983); Powerplant and Industrial Fuel Act of 1978, 42 U.S.C. § 8441(e)(4) (1983); Communications Act of 1934, *as amended*, 47 U.S.C. § 224(a)(3) (Supp. 1985); Cable Communications Policy Act of 1984, 47 U.S.C. § 522(15) (Supp. 1985); Motor Carrier Safety Act of 1984, 49 U.S.C. § 2503(10) (Supp. 1985); *cf.* Intergovernmental Cooperation Act of 1970, 42 U.S.C. § 4762(3) (1983) (specifying "State" excludes political subdivisions); *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 608 (1991) (in context of the Federal Insecticide, Fungicide, & Rodenticide Act, the "exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entities the statute empowers" (alterations in original)); *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 215 (1984) (local ordinance has to comport with the Privileges and Immunities Clause because "a municipality is merely a political subdivision of the State from which its authority derives").

This Court has recently reviewed the NYCHRL's standards for sexual harassment, contrasting them to those of Title VII or the pre-amendment NYSHRL. *See McHenry*, 510 F. Supp. 3d at 65–66; *see also Cano v. SEIU Loc. 32BJ*, No. 19 Civ. 8810 (PAE) (KHP), 2021 WL 4480274, at *11 (S.D.N.Y. Sept. 30, 2021). To state a sexual harassment claim under the NYCHRL, a plaintiff need only simply allege facts showing that she "was subjected to 'unwanted gender-based conduct.'" *McHenry*, 510 F. Supp. 3d at 66 (quoting *Erasmus v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *7 (S.D.N.Y. Nov. 30, 2015)). Ultimately, a plaintiff "need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" *Id.* (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)); *see also Williams*, slip op. at 25 ("The plaintiff need only show that her employer treated her 'less well than other employees,' at least in part for a discriminatory reason." (citation omitted)). Those standards reflect that courts must "construe [the NYCHRL] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Caravantes v. 53rd St. Partners, LLC*, No. 09 Civ. 7821 (RPP), 2012 WL 3631276, at *13 (S.D.N.Y. Aug. 23, 2012) (alterations omitted) (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (N.Y. 2011)). At the same time, "district courts must be mindful that the NYCHRL

---

Reading the EFAA to encompass local laws is also consistent with the statute's broad stated purposes—to "prohibit the enforcement of mandatory, pre-dispute arbitration . . . provisions in cases involving sexual assault or sexual harassment," H.R. Rep. No. 117-234, at 3 (2022), "restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system," *id.* at 4, and allow "others [to] learn[] of widespread misconduct," *id.* at 5. Interpreting the EFAA as reaching local laws aligns with Congress's judgment that sexual assault and harassment cases belong, as a category, in courts—and not in "secretive" arbitration proceedings that "often favor[] the company over the individual." *Id.* at 4. Defendants have not argued for the contrary result.

is not a general civility code," *McHenry*, 510 F. Supp. 3d at 66 (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 76 (2009)), and does not apply to conduct that "a reasonable victim would consider petty slights and trivial inconveniences," *Williams*, slip op. at 26 (citation omitted).

### 3.    Application to Yost's Claims

The Everyrealm defendants argue that the SAC's NYCHRL allegations do not plausibly plead that Yorio's conduct was "because of" Yost's gender, sex, or sexual orientation.[11]  *See* Everyrealm MTD Mem. at 7–9; *see also* Everyrealm MTD Opp. at 12–15 (Yost, disagreeing). The Everyrealm defendants are correct.

The SAC's factual allegations in support of a claim of sexual harassment are threadbare. As reviewed above, these essentially involve Yorio's having spoken either to Yost, or in Yost's presence, about the sexual activities or orientations of coworkers.  The SAC does not supply any basis to infer that Yorio's chatter to this effect had anything to do with Yost's "gender" or "sex." Yost accordingly defends this claim on the ground that Yorio's remarks were based on Yost's sexual orientation.

Such a showing is necessary.  Under the NYCHRL, as under Title VII and the NYSHRL, generalized hostility or generally uncivilized behavior is not actionable.  Whether a claim in a

---

[11] Defendants also fault the SAC for failing to allege—as the NYCHRL requires—that the impact of the asserted sexual harassment was felt in New York City. *See Pedroza v. Ralph Lauren Corp.*, No. 19 Civ. 8639 (ER), 2020 WL 4273988, at *2 (S.D.N.Y. July 24, 2020); *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 291 (2010); Everyrealm MTD Mem. at 14–17.  That critique is substantially correct, in that the SAC is, overwhelmingly, silent as to where the conduct by Yorio that forms the basis of the SAC's sexual harassment claims took place. *See, e.g.*, SAC ¶¶ 63–71, 76–79. Yost, however, submitted a declaration in defending an earlier version of her complaint against dismissal in which she represented that all conduct occurred in New York City. *See* Dkt. 25.  For the purposes of this discussion, the Court assumes, *arguendo*, that all of Yorio's alleged conduct occurred in New York City.

complaint is cast as alleging sexual harassment or hostile work environment,[12] the defendant's offending conduct must have been keyed to a protected characteristic of the plaintiff. *See, e.g., Stinson v. City Univ. of N.Y.*, No. 17 Civ. 3949 (KBF), 2018 WL 2727886, at *8 (S.D.N.Y. June 6, 2018) ("In order to prevail on a hostile work environment claim under the NYCHRL, a plaintiff must show that she was treated 'less well than other employees' on the basis of a protected characteristic."); *Goodwine v. City of New York*, No. 15 Civ. 2868 (JMF), 2016 WL 3017398, at *9 (S.D.N.Y. May 23, 2016) (NYCHRL requires that conduct was based on protected characteristic); *Harris v. NYU Langone Med. Ctr.*, No. 12 Civ. 0454 (RA) (JLC), 2013 WL 3487032, at *27 (S.D.N.Y. July 9, 2013) ("[T]he broader remediation available under the [NYCHRL] does not allow the Plaintiff to dispense with linking his claim of hostility to some attitude that the law forbids."), *report and recommendation adopted*, 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013); *see also Shukla v. Deloitte Consulting LLP*, No. 19 Civ. 0578 (AJN) (SDA), 2020 WL 3181785, at *10–11 (S.D.N.Y. June 15, 2020) (dismissing NYCHRL hostile work environment and discrimination claims where complaint did not allege that discrimination was "based upon [plaintiff's] gender"); *cf. Mihalik*, 715 F.3d at 114–15 (reversing dismissal of NYCHRL claim where supervisor's unwanted sexual attention towards employee, including two sexual propositions, was "because of" plaintiff's sex).

---

[12] Under the NYCHRL, "[t]he standards for discrimination and hostile work environment are the same." *Raji v. Societe Generale Ams. Sec. LLC*, No. 15 Civ. 1144 (AT) (JLC), 2018 WL 1363760, at *7 (S.D.N.Y. Feb. 28, 2018); *Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (same); *Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671 (JPO), 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) ("Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims; rather, there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, *inter alia*, on gender." (internal quotation marks omitted)).

Here, the SAC alleges Yorio made a handful of comments relating to sex.[13] Even viewed in their totality, these statements fall far short of stating an NYCHRL claim. *See Williams*, slip op. at 23 (considering totality of circumstances in assessing hostile work environment claim); *Mihalik*, 715 F.3d at 111 (same). Of Yorio's statements, only two addressed sexual orientation at all. Neither was about Yost; both concerned other employees. *See* SAC ¶¶ 64 (Yorio asked Yost's opinion about whether a senior executive was "in the closet"), 69–70 (Yorio believed a cofounder was a "virgin" and "asexual or bisexual" because of his disinterest in "pretty girls" whom Yorio had set him up with).

Yorio's other conduct on the topic of sex, as alleged, included repeating another employee's statement that a coworker's "balls will be in [his or her] mouth by the end of the night," *id.* ¶ 66, gossiping that two employees were "sleeping together," *id.* ¶ 73, and remarking that an Everyrealm cofounder, whom she had previously speculated was "in the closet," "can't manage [his or her] way out of a paper bag," *id.* ¶ 71. The SAC does not link these comments to Yost's sexual orientation. The SAC instead declares that Yorio must have believed Yost's bisexuality made her "an expert on others' sexual orientations." *Id.* ¶ 63. Such is, however, the

---

[13] The SAC does not allege conduct by either of the other individual defendants sounding in sexual harassment. As to Hungate, whose conduct is described at SAC ¶¶ 130–58, his conduct is described as "harassing." *See, e.g., id.* ¶¶ 146, 151. That adjective itself must be put aside as conclusory. *See Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012) (summary order) ("A court must first ignore mere conclusory statements." (internal quotation marks omitted)). In any event, Yost's allegations do not plausibly support the inference that Hungate's angry outburst had any connection to Yost's gender or sexual orientation. *See Mihalik*, 715 F.3d at 110 ("To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her gender."); *see, e.g., Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 302 (S.D.N.Y. 2019) (dismissing NYCHRL claims where complaint did not allege facts linking misconduct to protected trait). As alleged, Hungate's outburst derived from Yost's refusal to fire an employee whom Hungate disliked. *See, e.g.,* SAC ¶¶ 142–48. Nor does the SAC allege any conduct on the part of Kerr that could so qualify. *See id.* ¶¶ 150, 154–57. The SAC's critique of Kerr is instead that he was lethargic, inebriated, and disengaged.

epitome of the conclusory statement in a pleading that a court must ignore. *See Pungitore*, 506 F. App'x at 42; *Goodwine*, 2016 WL 3017398, at *8. The Court accordingly puts aside these comments about others' sexual doings or predilections. Such remarks, however inappropriate or infantile, are disconnected from any protected characteristic of Yost's.

The SAC's claim of sexual harassment therefore reduces to the two comments, above, by Yorio about other employees' sexual orientations. Despite amending her complaint twice and being admonished to include in her SAC all factual allegations relevant to such claims, Yost has proven unable to allege any other comments by Yorio (or any other defendant) regarding sexual orientation—and no comments whatsoever about Yost's. That lacuna is telling. *See, e.g.,* *Scalercio-Isenberg v. Morgan Stanley Servs. Grp. Inc.*, No. 19 Civ. 6034 (JPO), 2019 WL 6916099, at *6 (S.D.N.Y. Dec. 19, 2019) (NYCHRL gender-based discrimination claim not plausibly pled where plaintiff failed to demonstrate defendants declined to hire her *because of* her gender); *Stinson*, 2018 WL 2727886, at *10 (NYCHRL claim not plausibly pled where plaintiff did not allege comments were "based on" protected characteristic because "[a]t no point in his lengthy complaint does plaintiff allege that any defendant commented on his race in any way"); *Goodwine*, 2016 WL 3017398, at *9 (NYCHRL hostile work environment claim not plausibly pled where plaintiff failed to allege gendered language "signal[ed] views about the role of women . . . in the workplace" (alterations in original)). And as to the two comments about others' sexual orientations, the mere allegation that Yorio knew of Yost's bisexuality does not, without more, connect these remarks to Yost's bisexuality. *See Scalercio-Isenberg*, 2019 WL 6916099, at *5–6 (no "connective tissue" for NYCHRL claim where plaintiff had disclosed she was a woman on application, but offered only her and others' speculation that protected status motivated defendants' failure to hire). On the contrary, based on Yost's SAC, Yorio presents as

a full-spectrum and unfiltered purveyor of gossip, with a special obsession with matters of sex and intimacy. But, decisively, the SAC does not supply any basis, besides conjecture, to link her two comments concerning others' same-sex or bisexual orientations to Yost's sexual orientation.

The SAC's allegations thus fall far short of those in cases where courts in this District have sustained claims of sexual harassment or hostile work environments under the NYCHRL based on sexual orientation. The SAC does not allege that Yorio ever referenced or asked about Yost's sexual orientation. *Cf. Small v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 1527 (GHW), 2023 WL 112546, at *8 (S.D.N.Y. Jan. 5, 2023) (NYCHRL claim plausibly pled where coworkers and administrators often discussed plaintiff's sexuality, supervisor questioned parents about plaintiff and his sexuality, and supervisor stated she did not like him because he is gay); *Sanderson v. Leg Apparel LLC*, No. 19 Civ. 8423 (GHW), 2020 WL 7342742, at *8 (S.D.N.Y. Dec. 14, 2020) (NYCHRL claim plausibly pled where supervisor made repeated comments about plaintiff's sexual orientation with intent to embarrass and diminish him); *Raji*, 2018 WL 1363760, at *1, *7 (NYCHRL claim plausibly pled where defendant asked if plaintiff was gay, called him a homophobic slur 30–40 times, and discussed or ridiculed the sexual orientations of other coworkers on multiple occasions). Nor does the SAC allege that Yorio displayed a general hostility toward non-heterosexual people or relationships. *Cf. Roberts v. United Parcel Serv., Inc.*, 115 F. Supp. 3d 344, 349–51, 371 (E.D.N.Y. 2015) (NYCHRL claim plausibly pled where supervisor repeatedly told plaintiff that "being lesbian is a sin" and "wrong," and that she was "going to hell").

The Court thus finds that the SAC fails to allege a plausible claim of sexual harassment under the NYCHRL. Insofar as the handful of crude remarks by Yost that are pled here are disconnected from any protected characteristic of the plaintiff's, sustaining her sexual

harassment claim would treat the NYCHRL as a general civility code, contrary to uniform case law. *See, e.g., Fattoruso v. Hilton Grand Vacations Co., LLC*, 873 F. Supp. 2d 569, 578 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 26 (2d Cir. 2013) (dismissing NYCHRL sexual harassment claim where "nothing . . . indicates that plaintiff was treated 'unequally' based upon his gender"); *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450–52 (E.D.N.Y. 2013) (dismissing NYCHRL sexual harassment claim where surgeon's inappropriate comments and curses directed at entire staff, not just one gender) (collecting like cases); *Casalino v. N.Y. State Cath. Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *7, *9 (S.D.N.Y. Mar. 30, 2012) (same); *see also Scalercio-Isenberg*, 2019 WL 6916099, at *6 (dismissing NYCHRL claim where no "connective tissue" between conduct and protected status); *Gonzalez*, 377 F. Supp. 3d at 302 (same); *Goodwine*, 2016 WL 3017398, at *9 (dismissing NYCHRL claim where supervisor referred to plaintiff "as a 'cunt' and 'bitch'" and "was once asked rhetorically if she was 'smoking crack'" but no allegations connected conduct to gender or race). It follows that the SAC's claims to the same effect under Title VII and the NYSHRL also fail. Both statutes also require that "the hostile or abusive treatment was because of [the plaintiff's] sex" or protected characteristic. *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012).

Accordingly, the SAC fails to allege a claim of sexual harassment under any body of law—city, state, or federal. The Court grants the Everyrealm defendants' motion to dismiss all sexual harassment claims in the SAC under Rule 12(b)(6).

### B. Does the EFAA Apply Where the Only Basis for So Claiming Are Implausibly Pled and Dismissed Claims of Sexual Harassment?

The dismissal of the SAC's sexual harassment claims presents a question of statutory construction. All agree that the EFAA is triggered by a complaint that plausibly pleads a claim of sexual harassment. But where, as here, a plaintiff's only basis for claiming that a complaint

triggers the EFAA are *implausibly* pled claims of sexual harassment, does the EFAA still operate

to invalidate a binding arbitration agreement?[14]

Under the EFAA, that threshold question is reserved for the Court. *See* 9 U.S.C. § 402(b)

(EFAA's applicability "shall be determined by a court, rather than an arbitrator," under Federal

law, "irrespective of whether the party resisting arbitration challenges the arbitration agreement

specifically or in conjunction with other terms of the contract containing the agreement," or

"whether the agreement purports to delegate such determinations to an arbitrator"); *Walters v.

Starbucks Corp.*, No. 22 Civ. 1907 (DLC), 2022 WL 3684901, at *2 (S.D.N.Y. Aug. 25, 2022).

And, temporally, the EFAA applies to this dispute. It applies to causes of action that accrued on

or after March 3, 2022, the day President Biden signed the statute into law.[15] Although the SAC

---

[14] Under the EFAA, the term "sexual harassment dispute" includes one "relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. § 401(4). Under this definition, the EFAA might be implicated by lawsuits other than the ones containing sexual harassment causes of action—for example, a lawsuit that brought a claim against an employer for retaliating against a plaintiff who had made a protected report of sexual harassment. *See* Amici Br. at 9. This case, however, does not contain claims of this nature, and the Court thus does not have occasion to consider how the EFAA would apply in such a context. Although Yost's memorandum of law pretends otherwise, *see* Everyrealm MTD Opp. at 1, the SAC does not anywhere allege retaliation for the reporting of sexual harassment. Rather, it claims retaliation against Yost for her claim that certain Everyrealm employment policies were gender-discriminatory. *See, e.g.*, SAC ¶¶ 22 ("Defendants retaliated against [Yost] when they terminated her the day after she informed her superiors . . . that she could not comply with their plainly illegal, retaliatory, and discriminatory personnel policies that made women . . . second-class employees at Everyrealm."), 212 (retaliation for "opposing unlawful employment practices"), 224 (same), 241 (same), 256 (retaliation for "rais[ing] concerns about discrimination towards women).

The EFAA also applies to "sexual assault dispute[s]." Because Yost's case does not allege sexual assault, the Court's discussion as to the EFAA's proper construction is framed solely in terms of "sexual harassment dispute[s]."

[15] *See* Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022); *see also Marshall v. Hum. Servs. of Se. Texas, Inc.*, No. 21 Civ. 529 (MAC), 2023 WL 1818214, at *3 (E.D. Tex. Feb. 7, 2023) (EFAA not retroactive; affirming arbitration award related to claims that accrued before March 3, 2022);

does not plead a plausible claim of sexual harassment, the Court treats the conduct on which its implausibly pled claims are based as having continued past the EFAA's effective date. *See, e.g.*, SAC ¶¶ 73, 76.

Everyrealm argues that, for the EFAA to make an arbitration agreement unenforceable, a plaintiff must allege conduct that, taken as true, states a plausible sexual harassment claim. Yost, via her amici, argues that even an implausibly pled such claim brings a case within the EFAA, so long as the claim was not sanctionably frivolous. *Compare* Everyrealm MTD Mem. at 9–14, *and* Everyrealm MTD Reply at 15–16, *with* Amici Br. at 5–8. This question appears to be one of first impression. The case law to address the EFAA has overwhelmingly addressed a different question: whether the plaintiffs' claims had accrued before the EFAA's effective date. *See supra* note 15. *But see also Pepe v. N.Y. Life Ins. Co.*, No. 22 Civ. 4005 (SSV), 2023 WL 1814879, at *4 n.19 (E.D. La. Feb. 7, 2023) (EFAA did not apply where complaint's factual allegations and two references to "harassment" did not describe sexual harassment). The Court's decision today in the companion case of *Johnson v. Everyrealm*, No. 22 Civ. 6669, did not have occasion to resolve that question, because Johnson's sexual harassment claim under the NYCHRL was plausibly pled.

When resolving a dispute over a statute's meaning, the Court "begin[s] with the statutory text, exhausting all the textual and structural clues bearing on its meaning and construing each word in its context and in light of the terms surrounding it." *United States v. Bedi*, 15 F.4th 222,

---

*Woodruff v. Dollar Gen. Corp.*, No. 21 Civ. 1705 (GBW), 2022 WL 17752359, at *3–4 (D. Del. Dec. 19, 2022) (compelling arbitration of claims that accrued before March 3, 2022); *Zuluaga v. Altice USA*, No. A-2265-21, 2022 WL 17256726, at *5 (N.J. Super. Ct. App. Div. Nov. 29, 2022) (per curiam) (same); *Walters*, 2022 WL 3684901, at *3 (same); *Steinberg v. Capgemini Am., Inc.*, No. 22 Civ. 489 (JRS), 2022 WL 3371323, at *3 (E.D. Pa. Aug. 16, 2022) (same); *Zinsky v. Russin*, No. 22 Civ. 0547 (MJH), 2022 WL 2906371, at *3–4 (W.D. Pa. July 22, 2022) (same); *Newcombe-Dierl*, 2022 WL 3012211, at *5 (same).

226 (2d Cir. 2021) (internal quotation marks and citations omitted).  Where the text is plain and

unambiguous, the Court's inquiry ends there.  *See BedRoc Ltd., LLC v. United States*, 541 U.S.

176, 183 (2004); *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003).  "Plain meaning draws

on 'the specific context in which that language is used.'" *Williams v. MTA Bus Co.*, 44 F.4th

115, 127 (2d Cir. 2022) (citation omitted).  However, "[i]f upon examination [the Court] find[s]

the text to be ambiguous, [it] look[s] to traditional canons of statutory construction for guidance

in resolving the ambiguity." *Id.*

The operative text here is in EFAA sections 402(a) and 401(4).  Section 402(a) provides

that "at the election of the person alleging conduct constituting a sexual harassment dispute," no

pre-dispute arbitration agreement shall be valid or enforceable "with respect to a case which is

filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual

harassment dispute." 9 U.S.C. § 402(a).  Section 401(4), in turn, defines a "sexual harassment

dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under

applicable Federal, Tribal, or State law." *Id.* § 401(4).

This statutory language requires some parsing.  The initial clause of § 402(a), which

serves to explain which party may invoke the EFAA, refers to the "person alleging conduct

constituting a sexual harassment dispute."  Read in isolation, this text could support that a

plaintiff, merely by describing conduct in the vernacular as "sexual harassment," could neutralize

an arbitration agreement, even if the plaintiff did not claim that such conduct violated the law.

Section 401(4), however, precludes that result.  It does so by requiring that the dispute

relate to "conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal,

or State law."  It thus requires the plaintiff to assert that the conduct violated such a law.  It does

so by modifying the term "alleged" with the qualifying words "to constitute sexual harassment under applicable Federal, Tribal, or State law."

Thus, although the term "alleged" commonly refers to an allegation of fact,[16] as used in § 401(4), the term adds a legal dimension to the required allegation. And § 401(4)'s concluding clause identifies the legal measuring stick. The conduct must have been "alleged to constitute sexual harassment *under applicable Federal, Tribal, or State law*." Congress's decision to add those qualifying words is significant. *See Bedi*, 15 F.4th at 226 (each word in a statute must be construed "in its context and in light of the terms surrounding it"). This plain language makes the EFAA inapplicable where there has not been an allegation that such conduct violated a law prohibiting sexual harassment.

The issue here then is whether—when a plaintiff's basis to invoke the EFAA is that her complaint claims a violation of a "Federal, Tribal, or State" law against sexual harassment—such a claim must be plausibly pled. Or, may the plaintiff, even after dismissal of a conclusory or otherwise deficient claim, nonetheless invoke the EFAA to block arbitration of the balance of her claims? The EFAA's text does not definitively decide this point. But for four reasons, the Court holds, the term "alleged" as used in § 401(4) is best read to implicitly incorporate the plausibility standard.

First, Rule 12(b)(6) is of long standing. And the plausibility standard used to guide it, which dates to *Twombly* (2007) and *Iqbal* (2009), is as familiar a standard as any used in modern

---

[16] *See* Black's Law Dictionary (11th ed. 2019) (defining "alleged" as meaning "asserted to be true as described"; an "allegation" is "[s]omething declared or asserted as a matter of fact, esp. in a legal pleading; a party's formal statement of a factual matter as being true or provable, without its having yet been proved"). "Alleged" is often contrasted with the word "proved"; an allegation need not ultimately be proven true to qualify as such. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64–65 (1987).

case law. *See, e.g., Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)

(plausibility standard is lower than probability). It would have been well-known to Congress

that federal courts use the plausibility standard to measure viable claims under Rule 12(b)(6). In

enacting a statute that expressly referred to allegations of violations of law, it is reasonable to

infer that Congress in 2022 was aware that only viably pled (that is, plausible) allegations of

sexual harassment law had the capacity to proceed past the pleading stage in federal court.

"Congress legislate[s] against a background of law already in place and the historical

development of that law." *Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006) (internal quotation

marks omitted); *see also Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 227 (2d

Cir. 2021) ("We presume that Congress legislates against the backdrop of existing law.");

*Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) (proper to presume that Congress legislated

against backdrop of the Federal Rules); *cf. Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1009 (D.C.

Cir. 1986), *cert. denied*, 482 U.S. 915 (1987) ("There is a firm presumption that the Federal

Rules of Civil Procedure apply in all civil actions" absent anything in a statute "indicat[ing] that

Congress meant to vitiate or reduce [their] requirements.").

     Second, requiring a sexual harassment claim to be capable of surviving dismissal at the

threshold of a litigation fully vindicates the purposes of the EFAA. The stated purpose of the

EFAA is to empower sexual harassment claimants to pursue their claims in a judicial, rather than

arbitral, forum. *See* H.R. Rep. No. 117-234, at 3–4 (2022). That important purpose is achieved

by enabling such a claimant, notwithstanding an otherwise valid arbitration agreement, to bring

her claims of sexual harassment in court and to litigate them there through the point of their

durable dismissal. And, as the Court holds today in the companion case, as long as a claim of

sexual harassment pends in a case, the EFAA, by its terms, blocks arbitration of the entire "case"

containing that claim. *See Johnson v. Everyrealm*, No. 22 Civ. 6669 (PAE) (S.D.N.Y. Feb. 24,

2023) (citation forthcoming). After the dismissal of all sexual harassment claim(s) for failure to

meet the plausibility standard, however, that purpose is not served by requiring the remaining

(that is, non-sexual harassment) claims in the case to be litigated in court, in the face of a binding

arbitration agreement.

Third, requiring such extraneous claims to be resolved in court after the dismissal of the

sexual harassment claims, barring a clear statutory command to do so, would affront Congress's

intent in enacting the FAA—of which, critically, the EFAA is a part. In evaluating statutory text,

a court must construe words "with a view to their place in the overall statutory scheme," mindful

that its "duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S.

473, 486 (2015) (internal quotation marks and citation omitted). The FAA famously reflects a

"liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333,

339 (2011). The FAA's mandate may be "overridden by a contrary congressional command,"

*CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quotation marks omitted), as, in fact,

the EFAA unequivocally does in explicitly removing cases sounding in sexual harassment (or

sexual assault) from arbitration.

But to read the EFAA tacitly to void arbitration agreements after the point at which

plaintiffs have proven themselves unable to plead claims of sexual harassment consistent with

*Iqbal*, 556 U.S. at 678 (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation"), could destabilize the FAA's statutory scheme. It would enable a

plaintiff to evade a binding arbitration agreement—as to wholly distinct claims, and for the life

of a litigation—by the expedient of adding facially unsustainable and quickly dismissed claims

of sexual harassment. Because the EFAA does not contain a clear command to that effect, the

Court declines to so construe it. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.").

Fourth, although not dispositive on this point, courts in other contexts have construed the statutory term "allege" in accord with the foregoing analysis. The Resource Conservation and Restoration Act ("RCRA"), for example, authorizes, *inter alia*, citizen suits "against any person . . . who is alleged to be in violation of" any requirement of its solid waste disposal provisions. 42 U.S.C. § 6972(a)(1)(A). In interpreting whether this provision required the alleged violation to be ongoing, the Second Circuit has presumed that, at a minimum, "the facts alleged . . . if true, would [have to] state a judicially cognizable claim" for the RCRA to apply. *See S. Rd. Assocs. v. Int'l Bus. Machines Corp.*, 216 F.3d 251, 257 (2d Cir. 2000); *cf. Conn. Coastal Fisherman's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1315 (2d Cir. 1993) (same, as to Clean Water Act; dismissing for failure to allege an ongoing violation); *see also Chart v. Town of Parma*, No. 10 Civ. 6179 (MWP), 2012 WL 3839241, at *7–9 (W.D.N.Y. Aug. 28, 2012) (performing "a close reading of the allegations against the statute" to determine whether the conduct alleged stated an ongoing violation of RCRA under Rule 12(b)(6)). The Second Circuit has similarly interpreted the Fair Labor Standards Act, whose three-year statute of limitations applies to "willful . . . alleged violations." *See* 29 U.S.C. § 2617(c)(2) ("[A]ction[s] brought for a willful violation of section 2615 of this title, . . . may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought."). The Circuit has read Rule 8's plausibility standard to inform this standard. Plaintiffs, it has held, "must plausibly allege willfulness to secure the benefit of the three-year exception at the pleadings stage," rather

than merely asserting willfulness conclusorily. *See Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 320 (2d Cir. 2021).

This case, in fact, supplies an excellent illustration of why such a construction would accord with the purposes of the FAA, as amended by the EFAA, and why Yost's alternative would not. Yost's initial and Amended Complaints, *see* Dkts. 1, 4, despite bringing a broad range of disparate employment-related claims against many defendants, did not bring any claims of sexual harassment. Only after the Everyrealm defendants moved to compel arbitration based on Yost's arbitration agreement, *see* Dkts. 9–12, did Yost suggest sexual harassment claims so as to implicate the EFAA, *see* MTC Opp. at 3–5, 6–7. The Court gave Yost an opportunity to plead such claims while admonishing her to assure that her amended complaint "contains all factual allegations bearing on her claim of sexual harassment." See Dkt. 34 at 2. Yost's SAC added such claims and factual support as Yost could, presumably, muster. However, the Court has held today, the sexual harassment claims in the SAC are conclusory and threadbare. They decisively fail the most lenient standard available for pleading sexual harassment—that of the NYCHRL. The Court accordingly has dismissed these claims. No further claims of sexual harassment remain in this case or could be brought, with Yost having exhausted her full fund of ostensibly germane factual material. The only references to sexual harassment that remain in the case thus are the SAC's conclusory labels of defendants' conduct as such.

In these circumstances, Yost's bid to block the arbitration of her remaining claims—which all arise from her employment and, at least as to the Everyrealm defendants, fall squarely within her arbitration agreements—is incompatible with the "liberal federal policy favoring arbitration agreements" undergirding the FAA. *CompuCredit Corp.*, 565 U.S. at 98 (quotation marks omitted). It would not advance the interest embodied in the EFAA of vindicating the

rights of sexual harassment claimants to litigate in court, because Yost has failed to plead facts plausibly placing her in that category of persons, and her lawsuit no longer concerns sexual harassment even in part. And it would invite mischief, by incenting future litigants bound by arbitration agreements to append bogus, implausible claims of sexual harassment to their viable claims, in the hope of end-running these agreements.

The Court accordingly holds that, with the SAC's sexual harassment claims having been dismissed as implausible, the EFAA no longer has any bearing on this litigation. To the extent that Yost's claims are covered by a valid arbitration agreement, these claims must be resolved in arbitration.

## III.    Enforcement of the Arbitration Agreement

The final step in analyzing the motion to compel arbitration entails determining which defendants and claims fall within the operative arbitration agreement. Certain conclusions are apparent, but to resolve reliably and fully the issues relating to the proper application of the arbitration agreements to the SAC, the Court will require supplemental briefing.

The first arbitration agreement is contained in Yost's December 21, 2021 Independent Contractor Agreement, which was between Yost and Everyrealm's predecessor, Republic Realm, Inc. *See* Dkt. 20-1. It provides:

> Arbitration. Except as provided in Section 13.5.2 below, Contractor agrees that any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement, shall be settled by arbitration to be held in the State of New York, in accordance with the rules then in effect of the American Arbitration Association. The arbitrator [sic] shall be final, conclusive, and binding on both Realm and Contractor. Judgment may be entered on the arbitrator's decision in any court having jurisdiction. Realm and Contractor shall each pay one-half of the costs and expenses of such arbitration, and each of Realm and Contractor shall separately pay counsel fees and expenses.

*Id.* at 13.5.1. The agreement also states:

> Severability. If one or more of the provisions in this Agreement is deemed **void**
> or unenforceable to any extent in any context, such provisions shall nevertheless
> be enforced to the fullest extent allowed by law in that and other contexts, and the
> validity and force of the remainder of this Agreement shall not be affected. If any
> term or provision set forth in Section 9 is ruled by a tribunal of competent
> jurisdiction to be excessively broad as to time, duration, geographical scope,
> activity or subject, the other provisions of this Agreement shall nevertheless stand
> and the construction and interpretation of Section 9 shall be deemed to be the
> longest period and/or greatest size permissible by law under the circumstances,
> and the parties hereto agree that such court shall reduce the time period and/or
> geographic scope to permissible duration or size.

*Id.* at 13.3 (emphasis in original).

The second arbitration agreement is contained in Yost's January 21, 2022 Employment

Agreement, which was also between Yost and Everyrealm's predecessor, Republic Realm, Inc.,

and contains substantially identical language. *See* Dkt. 12-2. It provides:

> Arbitration. Except as provided in Section 13(e)(ii)[17] below, you agree that any
> dispute or controversy arising out of or relating to any interpretation,
> construction, performance or breach of this Agreement, shall be settled by
> arbitration to be held in the State of New York, in accordance with the rules then
> in effect of the American Arbitration Association. The arbitrator [sic] shall be
> final, conclusive, and binding on both the Company and you. Judgment may be
> entered in any court having jurisdiction. The Company and you shall each pay
> one-half of the costs and expenses of such arbitration, and each of the Company
> and you shall separately pay counsel fees and expense

*Id.* § 13(e)(i)). The agreement also states:

> Severability. If one or more of the provisions in this Agreement are deemed void
> or unenforceable to any extent in any context, such provisions shall nevertheless
> be enforced to the fullest extent allowed by law in that and other contexts, and
> the validity and force of the remainder of this Agreement shall not be affected.
> If any term or provision set forth in . . . Section 13 is ruled by a tribunal of
> competent jurisdiction to be excessively broad as to . . . activity or subject, the
> other provisions of this Agreement shall nevertheless stand and the construction
> and interpretation of such term or provision shall be deemed to be the longest
> period and/or greatest size permissible by law under the circumstances, and the

---

[17] Section 13(e)(ii), like Section 13.5.2 of the preceding agreement, relates to equitable remedies.
This exception is irrelevant here.

parties hereto agree that such court shall reduce the time period and/or geographic scope to permissible duration or size.

*Id.* § 13(c).

The third arbitration agreement is contained in Yost's January 24, 2022 Workplace Employment Agreement, between Republic Realm, Inc., and Justworks. *See* Dkt. 79-1. It includes a lengthy arbitration provision that "supersedes any and all prior agreements regarding [arbitration]." *Id.* ¶ 10. This agreement, which refers to Republic Realm, Inc., as Yost's "Worksite Employer," provides that the parties:

> [A]gree to use binding arbitration as the sole and exclusive means to resolve all disputes that may arise between you and Worksite Employer and/or you and Justworks, including, but not limited to, disputes regarding termination of employment and compensation. You specifically waive and relinquish your right to bring a claim against Worksite Employer and/or Justworks, in a court of law, and this waiver shall be equally binding on any person who represents or seeks to represent you in a lawsuit against Worksite Employer or Justworks in a court of law. Similarly, Worksite Employer and Justworks specifically waive and relinquish their respective rights to bring a claim against you in a court of law, and this waiver shall be equally binding on any person who represents or seeks to represent Worksite Employer or Justworks in a lawsuit against you in a court of law.

*Id.* The arbitration provision also extends to all claims by Yost against "Worksite Employer (or its owners, directors, officers, managers, employees or agents)" and the same for Justworks. *Id.* And it

> [I]nclude[s] within [its] scope . . . all disputes, whether based on tort, contract, statute (including, but not limited to, any claims brought under the Fair Labor Standards Act or any other similar state or local law or regulation, or claims of discrimination, harassment and/or retaliation, whether they be based on the Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the American with Disabilities Act . . . or other similar local, state, or federal law or regulation), equitable law, or otherwise.

*Id.* Unlike the Employment Agreement, the arbitration provision does not include a provision for cost-splitting. *Id.*

It is clear to the Court that, by their terms and familiar principles of construction, any of these agreements covers all of the SAC's claims against the Everyrealm defendants (Everyrealm and its officers or employees Yorio, Schwartz, and Kerr). Those defendants have moved to compel arbitration based on the Employment Agreement.[18] *See* MTC Mem. at 9–15. Although the parties have not addressed the Workplace Employment Agreement, the broad terms of that agreement, too, clearly cover such claims and defendants.

However, in part because the third agreement came to light late, and in part because of gaps in the briefing, including as to whether the affiliate defendants join in the motion to compel arbitration,[19] several issues potentially bearing on the motion to compel require supplemental briefing.[20] These are:

1. Which arbitration agreement controls, and why?

2. Do the SAC's claims against the affiliate defendants fall within the scope of the governing arbitration agreement? If so, do the affiliate defendants move to compel arbitration of these claims?

---

[18] Yost argued, in her opposition to the motion to compel, that the Employment Agreement did not apply to the initial period in which she worked for Everyrealm as an independent contractor. MTC Opp. at 9–10. In reply, the Everyrealm defendants came forward with the Independent Contractor Agreement. *See* Dkt. 20-1; MTC Reply at 2 (faulting Yost for so arguing while failing to disclose this agreement).

[19] The affiliate defendants adopted the Everyrealm defendants' motion to dismiss the sexual harassment claims, which in turn sought, upon dismissal, to compel arbitration. *See* Affiliate MTD Mem. at 18 (citing Dkt. 41). The Court infers that the affiliate defendants, if found within the scope of an operative arbitration agreement, move to compel arbitration. On supplemental briefing, the Court expects a clearer statement on this point.

[20] The parties' briefs with respect to the application of the arbitration agreements address issues beyond those listed here. The Court does not invite further briefing on those other issues.

3. Insofar as Yost has argued that, given her financial circumstances, it would be unconscionable to apply a cost-splitting provision in the Employment Agreement to her, *see* MTC Opp. at 15–19, (a) is the determination of unconscionability to be made by the Court or an arbitrator; (b) has the cost-splitting provision in the Employment Agreement (and in the earlier Independent Contractor Agreement) been overtaken by the Workplace Employment Agreement, whose arbitration clause does not contain such a provision; (c) if that provision does apply in an arbitration, what costs are implicated by that provision, and on what concrete basis would it be unconscionable to apply a cost- (not fee-) splitting agreement to Yost, given that in the litigation she has initiated, or in an arbitration not governed by such a provision, Yost would presumably be responsible for paying her own costs; and (d) if it were found unconscionable to compel Yost to split costs with defendants, is the proper remedy pursuant to the severance provisions in the Independent Contractor and Employment Agreements to sever that provision and otherwise proceed with the arbitration pursuant to the parties' agreement, *see, e.g.*, *Valle v. ATM Nat., LLC*, No. 14 Civ. 7993 (KBF), 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (finding unconscionability as applied, and therefore severing the challenged "loser pays" provision from an arbitration agreement)?

The Court directs counsel to brief these issues expeditiously, with Yost's brief due Friday, March 10, 2023, and defendants' brief(s) due Friday, March 24, 2023. The Court does not invite a reply. Pending the resolution of the motion to compel arbitration, the Court does not invite submissions on other issues, whether in the form of motions to amend, dismiss, or for sanctions, as to each of which one or more parties has signaled an interest in moving. The Court reminds counsel that, in the likely event that a motion to compel arbitration is granted, in whole

or in part, the Court would thereupon stay proceedings in this Court pending the resolution of the arbitration. *See Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court grants the Everyrealm defendants' motions to dismiss the sexual harassment claims in Yost's Second Amended Complaint, and holds that, with the dismissal in full of these claims, the EFAA no longer has any bearing on the pending motion to compel arbitration in this case. The Court directs the Clerk of Court to terminate the motions pending at docket numbers 10, 40, and 55.

The Court has identified in this decision open questions relating to the motion to compel arbitration that require supplemental briefing, including as to the operative arbitration agreement and whether it covers all or only some defendants, and including relating to Yost's claim that it would be unconscionable to apply a cost-splitting provision to her. *See supra* Section III. The Court directs Yost to file a brief addressing these issues by Friday, March 10, 2023. The Court directs defendant(s) to file brief(s) on these issues by Friday, March 24, 2023.

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: February 24, 2023
     New York, New York